Donald H. RUMSFELD, Secretary of Defense, Appellant,

v.

FREEDOM NY, INC., Appellee.

Freedom NY, Inc., Appellant,

v.

Donald H. Rumsfeld, Secretary of Defense, Appellee.

Nos. 02–1105, 02–1130.

United States Court of Appeals, Federal Circuit.

DECIDED: May 22, 2003.

of Contract Appeals' ("Board's") decision holding invalid two settlement agreements (Modifications 25 and 29) between the government and the contractor and awarding a price adjustment pursuant to the "Government Delay of Work" clause in the contract. *Freedom NY, Inc.*, ASBCA No. 43965, 01–2 B.C.A. (CCH) ¶ 31,585 at 156,-043, 2001 WL 1143312 (2001). Freedom New York, Inc. ("contractor") cross appeals the Board's decision declining to find a cardinal change, bad faith, or constructive change (based on the contractor's inability to obtain state-of-the-art equipment, allegedly because of government actions), and declining to award consequential breach damages or additional interest the contractor now claims was due. We hold that the Board properly held that Modification 29 was invalid on grounds of duress but erred in holding Modification 25 ineffective because the government breached an alleged side agreement. In all other respects, we affirm. Thus, we affirm in part, reverse in part, and remand.

## BACKGROUND

This contract dispute has a long and complex history which is fully recounted in the Board's decision. *Freedom NY*, 01–2 B.C.A.(CCH) at 156,045–061. We will summarize the portions relevant to this appeal.

The contractor's predecessor, Freedom Industries, Inc. ("FII"), was put on a list of approved producers of Meal, Ready to Eat ("MRE") combat rations in March of 1983 by the Defense Logistics Agency ("DLA") and the Defense Personnel Support Center ("DPSC") (collectively "government"). FII was awarded MRE contract No. DLA13H–85–C–0591, in the amount of $17.2 million, on November 15, 1984. This contract represented the contractor's only business, a fact known to the government. The government agreed to

William K. Olivier, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for the Secretary of Defense. With him on the brief was David M. Cohen, Director.

Gilbert J. Ginsburg, of Washington, DC, argued for Freedom NY, Inc. Of counsel on the brief were Neil H. Ruttenberg, of Beltsville, MD; and Shlomo D. Katz, Epstein Becker & Green, P.C., of Washington, DC.

Before SCHALL, GAJARSA, and DYK, Circuit Judges.

DYK, Circuit Judge.

The Secretary of Defense ("government") appeals the Armed Services Board

make progress payments in the amount of 95% of incurred costs.

The contractor agreed to process, assemble, and package MREs that contained twelve separately packaged menu items, some of which were to be provided by the government, others by the contractor. The final lot of MREs was due, F.O.B. Bronx, New York, on December 31, 1985, with progress payments to be made periodically. All costs were treated as direct; and, since this was the contractor's only contract, all costs were allocable to it.

The contract also incorporated several clauses from the Defense Acquisition Regulations ("DAR"), including two concerning the government's right to withhold progress payments for defaults by the contractor: "Progress Payments for Small Business Concerns" (32 C.F.R. § 7–104.35(b) (1982)) and "Progress Payments" (32 C.F.R. 7–2003.64 (1974)). The first of these clauses provided, in pertinent part:

> The Contracting Officer may reduce or suspend progress payments, or liquidate them at a rate higher than the percentage stated in (b) above [95%], or both, whenever he finds upon substantial evidence that the Contractor (i) has failed to comply with any material requirement of this contract, (ii) has failed to make progress, or is in such unsatisfactory financial condition, as to endanger performance of the contract, (iii) has allocated inventory to this contract substantially exceeding reasonable requirements, (iv) is delinquent in payment of the costs of performance of this contract in the ordinary course of business, (v) has so failed to make progress that the unliquidated progress payments exceed the fair value of the work accomplished on the undelivered portion of this contract, or (vi) is realizing less profit than the estimated profit used for establishing a liquidation percentage in paragraph (b), if that liquidation percentage

is less than the percentage stated in paragraph (a)(1).

32 C.F.R. § 7–104.35(b), ¶ (c) (1982). The second clause provided, in pertinent part::

> The appropriate "Progress Payment" clause ... included in the contract ... shall be inoperative during the time the contractor's accounting systems and controls are determined by the Government to be inadequate for segregation and accumulation of contract costs.

32 C.F.R. § 7–2003.64 (1974).

The contract did not run smoothly. The contractor repeatedly missed deadlines for delivery of the MRE's. The contractor claimed that the government was interfering with its ability to perform the contract by, among other things, failing to make timely progress payments. The government claimed that the contractor was in default, and thus repeatedly delayed progress payments, or failed to make them at all.

In one of many efforts to settle their respective claims, the contractor and the government negotiated Modification 25, which was signed by both parties on May 29, 1986. Among other things, it released the government from "all claims for all happenings and/or occurrences which have arisen to date under law and/or relating to the contract,". except for a specific occurrence involving a subcontractor. *Freedom NY*, 01–2 B.C.A. (CCA) at 156,056. In return, the contractor received an extension of the delivery schedule and a price adjustment. The modification contained an integration clause as follows: "Both parties expressly state that the aforesaid recitals are the complete and total terms and conditions of their Agreement." *Id.*

During the course of the negotiations concerning the modification, the government allegedly agreed to the provisions of a side agreement which was not included in the final document signed by both par-

ties. This alleged side agreement was memorialized in two letters sent by the contractor along with what would become Modification 25. These letters were substantively identical, and both were sent before the execution of Modification 25 on May 29, 1986. The first letter was sent May 13, 1986; the second, which corrected some minor mistakes, was sent May 28, 1986. The letters both stated that the "settlement is reflected *in part* in the Contract Modification" and requested that the side agreement "be confirmed as soon as practical." (J.A. 298, 300, 301, 303) (emphasis added). This alleged side agreement consisted solely of promises supposedly made by the government, most importantly that, if the contractor were "otherwise qualified," the government would "negotiate a fair and reasonable contract" with the contractor for additional MRE's to be provided beginning in 1987. The government's only response was a May 30, 1986, letter which denied that such a side agreement existed, and it is undisputed that the government did not perform the promises allegedly made therein.

Modification 25 did not resolve the disputes between the contractor and the government, nor did Modifications 26, 27, or 28. The parties began negotiations for Modification 29 in the fall of 1986. While these negotiations were occurring, the administrative contracting officer approved progress payment 21, in the amount of $700,000, on October 3, 1986. An internal government memorandum recited that "[c]onsidered in [the administrative contracting officer's] decision was the best interest of the Gov't., the contract loss ... progress payments and cases accepted to date ... disallowances and Modification [29]." Despite the administrative contracting officer's approval, and even though the government knew that the contractor was in financial distress, the government withheld progress payment 21 and informed

the contractor that it would not make the payment until the contractor agreed to Modification 29. The contractor did so on October 7, 1986. Modification 29 released the government from "all manner of action, causes of action, suits, proceedings ... damages, claims, and demands whatsoever, in law or equity or under administrative proceedings," except for those related to Zyglo testing of the rations. *Freedom NY,* 01–2 B.C.A. (CCA) at 156,057. In return, the government extended the delivery schedule by one month. *Id.*

The contract was terminated for default by the government in 1987. In 1991, the contractor brought a claim for breach of contract, constructive change, and improper termination for default before the contracting officer. This was denied, and the contractor appealed to the Board. The scope of the contractor's appeal—specifically, whether it was limited to determination of whether the government had properly terminated the contract for default, or whether it also included breach claims— was unclear. In May 1996 the Board held that the default termination had been improper. The default termination was therefore converted to a termination for convenience; the decision was, in this respect, favorable to the contractor. *Freedom NY, Inc.,* 96–2 B.C.A. (CCH) ¶ 28,328 at 141,479, 1996 WL 242320 (1996).

However, the Board also went on to deny the contractor's claims for breach of contract. In so doing, the Board made determinations that were adverse to the contractor, including that the alleged side agreement was not part of Modification 25 and that Modification 29 was not obtained by duress. The contractor moved to vacate the portion of the decision that denied its contract claims on the ground that it had been surprised to its prejudice because it had not expected that the appeal would include a determination of its con-

tract claims. In August 1996 the Board agreed with the contractor. *Freedom NY, Inc.*, ASBCA Nos. 35671 & 43965, 96–2 B.C.A. (CCH) ¶ 28,502 at 142,323, 1996 WL 478747 (1996). "From the moment [the appeal] was docketed there had been confusion as to the scope of the appeal," the Board held. *Id.* The Board therefore vacated the parts of its May 1996 decision that were related to the contract claims, including the determinations that the alleged side agreement was not part of Modification 25 and that Modification 29 had not been obtained by duress, and reinstated the contractor's appeal to that extent. *Id.* at 142,325. The Board also "correct[ed] the findings and conclusions of law" in its previous decision to the extent provided in an appendix, although it (apparently inadvertently) failed to remove some findings of fact that formed the basis of the parts of its decision that had been vacated. *Id.*

Thereafter, the parties stipulated to some facts, and an eleven-day trial was held to resolve the others. During the trial, the Board heard conflicting testimony about the alleged side agreement to Modification 25. Henry Thomas, the contractor's president, testified that the modification to which the contractor agreed was reflected only in part in the language of Modification 25; the rest of the agreement was reflected in the letters of May 13 and 28. He also testified that the contractor would not have agreed to Modification 25 without the alleged side agreement, and that the government knew this. When asked how he knew that the government had agreed to the alleged side agreement, Thomas testified that the government was in possession of it and "[n]o one objected. Nobody sent me anything. Nobody called me. Nobody said anything." (Tr. at 650.) Colonel Frank Francois, a consultant hired by the contractor, testified that at the meeting when Modification 25 was signed (which he had attended), the procuring

contracting officer told the contractor that he had approval to agree only to Modification 25. However, Francois testified that he (Francois) understood Modification 25 to include the alleged side agreement. The procuring contracting officer testified that, while he had received the letters, Modification 25, as written, contained the parties' complete agreement. He testified, "There is no side agreement. There is no attachment to the modification." *Freedom NY*, 02–1 B.C.A. (CCH) at 156,056. A letter from the executive director of contracting at DLA to the contractor on May 30, 1996, also denied that there was a side agreement, stating:

> [Y]our letter [of May 28] indicated that other parts of our agreement are not reflected in the contract modification. This is not correct. The agreement reached as a result of our discussion is contained in whole and in its entirety in the contract modification.

(J.A. at 308.)

In November of 2000, the parties settled the amount due for termination subject to any adjustment made as a result of the appeal pending before the Board.

On August 28, 2001, the Board rendered its decision. *Freedom NY*, 01–2 B.C.A. (CCH) at 156,043. It held that the government had breached the contract in several ways, including its repeated failure to make progress payments. *Id.* at 156,061. The Board further held, contrary to its earlier vacated finding, that the alleged side agreement was part of Modification 25 and that the government had breached it. *Id.* at 156,066. It credited the testimony of Thomas and "attach[ed] no probative weight" to the contracting officer's testimony because of "the documents in evidence and [his] demeanor, persistently selective recall of facts and evasive, argumentative, and ambiguous testimony." *Id.* at 156,056. Because it found the alleged

side agreement to be part of Modification 25 and that it was breached, the Board held the release in Modification 25 could not be enforced. *Id.* at 156,066. It did not decide other alleged grounds for non-enforcement of Modification 25, including "lack of consideration, duress, unconscionability or fraud." *Id.*

Also contrary to its earlier, vacated finding, the Board held that the release in Modification 29 could not be enforced because it had been obtained by duress. *Id.* at 156,067. The elements of duress, the Board held, were:

> (1) [O]ne party involuntarily accepted the terms of another; (2) the circumstances permitted no other alternative; (3) such circumstances were the result of coercive acts of the other party.

*Id.* The coercive act, the Board held, was the government's withholding of the progress payment. The contract "gave the contracting officer no right to withhold an approved progress payment until the contractor signed a contract modification," the Board explained. *Id.* The Board found that the government's conduct "was the predominant, if not sole, cause of" the contractor's performance problems, and hence its financial distress. *Id.* at 156,060. Since the government "was well aware of the contractor's financial distress," the Board concluded, its "delaying of payment ... coerced [the contractor] to sign [Modification 29]." *Id.* at 156,067.

The Board held, however, that the contractor could recover only under the standard "Government Delay of Work" clause, which provided equitable adjustment for government delay, including a delay "by an act of the Contracting Officer in the administration of this contract, which act is not expressly or impliedly authorized by this contract," *i.e.*, a breach. 33 C.F.R. § 7–104.77(f) (1984). The Board held that the contractor could not recover for breach of contract, because the government's breaches all constituted government delay. "A contractor cannot maintain a breach claim for Government delay when relief is available under the contract," the Board explained. *Id.* at 156,067.

The contractor moved for reconsideration on October 11, 2001, arguing, among other things, that the government delays constituted a constructive change of the method of performance of the contract; that the government's conduct resulted in a cardinal change; and that the contractor was entitled to damages for contracts later awarded to other contractors. On December 7, 2001, the Board denied the motion. *Freedom NY, Inc.,* 02–1 B.C.A. (CCH) ¶ 31,676 at 156,538, 2001 WL 1598349 (2001). With respect to the first argument, the Board held that the "Delay of Work" clause precluded recovery for constructive change under the "Changes" clause (which allowed recovery of lost profits) based on government delay. *Id.* at 156,539. With respect to the cardinal change, the Board held that the facts previously found by the Board, which the contractor did not dispute, "d[id] not establish that appellant performed duties 'materially different from those originally bargained for' and 'beyond the scope of the contract.'" *Id.* at 156,540 (quoting *Air–A–Plane Corp. v. United States,* 187 Ct.Cl. 269, 408 F.2d 1030, 1033 (1969) and *Allied Materials & Equip. Co. v. United States,* 215 Ct.Cl. 406, 569 F.2d 562, 563–64 (1978)). It therefore concluded that there was no cardinal change. *Id.* With respect to the third argument, the Board held that damages for failure to obtain future contracts were too speculative because the terms of the contract "expressly did not require the Government to award any contract to the appellant [as an approved MRE producer]." *Id.*

The government timely appealed. The contractor cross appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(b).

## DISCUSSION

We review the Board's decision under the following standard:

> [T]he decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

41 U.S.C. § 609(b) (2000). The substantial evidence standard requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *AT&T Communications, Inc. v. Perry*, 296 F.3d 1307, 1311 (Fed.Cir.2002) (quoting *Consol. Edison. Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). We review the Board's legal conclusions without deference. *Rex Sys., Inc. v. Cohen*, 224 F.3d 1367, 1371 (Fed.Cir.2000).

## I

The government's primary contention on appeal is that the Board erred in its conclusion that Modifications 25 and 29 did not release the government from liability.

█ In the course of performance of a government contract, disputes arise between the contractor and the government with some frequency. Federal policy favors settlement of disputes before they develop into litigation. "The Government's policy is to try to resolve all contractual issues in controversy by mutual agreement at the contracting officer's level. Reasonable efforts should be made to resolve controversies prior to the submission of a claim." 48 C.F.R. § 33.204 (2002). The prompt settlement of those disputes serves the interests of the contractor, the government, and the public at large. In post-contract litigation, the Board and the courts should be reluctant to invalidate such settlements absent a clear showing of invalidity. " '[T]hose who employ the judicial appellate process to attack a settlement through which controversy has been sent to rest bear a properly heavy burden' of proof that the agreement was improperly obtained." *Tiburzi v. Dep't of Justice*, 269 F.3d 1346, 1355 (Fed. Cir.2001) (quoting *Asberry v. United States Postal Serv.*, 692 F.2d 1378, 1380 (Fed.Cir.1982)).

Here we conclude that the Board erred in invalidating Modification 25 on the ground that the government had breached an alleged side agreement, but that the Board correctly concluded that Modification 29 was invalid due to duress.

### A. Modification 25

The parol evidence rule provides that when a document is integrated, "barring certain limited exceptions (e.g., fraud), a party to a written contract cannot supplement or interpret that agreement with oral or parol statements that conflict with, supplant, or controvert the language of the written agreement itself." *Schism v. United States*, 316 F.3d 1259, 1278 (Fed.Cir. 2002) (en banc). The rule is so well established that "no citation is necessary to support [it]." *Id.* As Williston explains, the rule "seeks to achieve the related goals of insuring that the contracting parties, whether as the result of miscommunication, poor memory, fraud, or perjury, will not vary the terms of written undertakings." Samuel Williston, *Williston on Contracts* § 33:1 (4th ed. 1999).

To be sure, if two separate agreements are negotiated at the same time, both of which meet applicable contract requirements, including consideration, both may be enforceable. *See, e.g.* John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 3.2(a) (4th ed. 1998); *Brennan v. Carvel*

*Corp.*, 929 F.2d 801, 806–07 (1st Cir.1991).[1] But that is not the situation here. It is admitted that the alleged side agreement cannot stand alone since the only consideration for the side agreement coming from the contractor was the execution of Modification 25 itself. We must therefore determine whether Modification 25 is completely integrated.

When a document is completely integrated, no additional terms may be added, whether consistent or inconsistent, through parol evidence. *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434 (Fed.Cir.1996) *See also* Restatement (Second) of Contracts § 216(1); Uniform Commercial Code § 2–202. Whether a contract is integrated is a question of law. *Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 458 F.2d 994, 1006 n. 9 (1972). We therefore review the finding of the Board without deference. *Id.*

We have recognized the importance of integration clauses in determining whether a contract is completely integrated. In *McAbee*, we emphasized that, although they are not dispositive, integration clauses create a "strong presumption that a contract [is], as it purport[s] to be, a fully-integrated agreement." 97 F.3d at 1434. One attempting to add terms to a contract with an integration clause "carries an extremely heavy burden in overcoming this attestation to the document's finality and completeness." *Id. See also Campbell v. United States*, 228 Ct.Cl. 661, 661 F.2d 209, 218 (1981) (Where a contract includes an integration clause, "it is a fair bet that the parties agreed to no more than they said.").

Where, as here, the parties are both commercial entities or the government, integration clauses are given particularly great weight. As the Second Circuit has stated, "the presumption of completeness is particularly strong where sophisticated parties have conducted extensive negotiations prior to entering into the agreement." *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 191 (2d Cir.2001). *See also Binks Mfg. Co. v. Nat'l Presto Industries, Inc.*, 709 F.2d 1109, 1116 (7th Cir.1982).

Here we conclude that, in light of the integration clause in the contract, the Board erred in invalidating Modification 25 on the ground that the government breached an alleged side agreement. Although our cases recognize that extrinsic evidence may be considered on the issue of integration,[2] we think that such circumstances are extremely limited where there is an integration clause. *See McAbee*, 97 F.3d at 1434. Like "most courts" we elect to follow the "traditional rule" set forth in

---

1. So too after an agreement is executed, it may be modified by a later agreement that satisfies the law of contracts and applicable government requirements. Arthur L. Corbin, *Corbin On Contracts*, § 574 (Interim ed. 2002).

2. *McAbee*, 97 F.3d at 1434. Where there is no integration clause, greater attention may be paid to the surrounding circumstances. As *McAbee* recognized, "extrinsic evidence is 'especially pertinent in instances where ... the writing itself contains no recitals or other evidence testifying to its intended completeness and finality.'" *Id.* (quoting *David Nassif Assoc. Inc. v. United States*, 214 Ct.Cl.

407, 557 F.2d 249, 256 (1977) (*Nassif I*)). *See also Nassif I*, 557 F.2d at 256 ("[I]t is not the writing alone which attests to its own finality and completeness but the circumstances surrounding its execution including the negotiations which proceeded it;" the contract "contain[ed] no recitals or other evidence testifying to its intended completeness and finality."); *Sylvania*, 458 F.2d at 1006, 1005–08 ("Parol or extrinsic evidence must be admissible on the issue of the extent to which a written agreement is integrated, for as has been said, the writing cannot prove its own integration;" the opinion makes no mention of an integration clause).

the third edition of the Williston treatise (described in Calamari & Perillo, *supra,* § 3.6), namely that an integration clause "conclusively establishes that the integration is total unless (a) the document is obviously incomplete or (b) the merger clause was included as a result of fraud or mistake or any other reason to set aside the contract." Calamari & Perillo, *supra,* § 3.4(c) (citing Samuel Williston, *Williston on Contracts,* § 633 (3d ed. 1957)).[3]

There are no such circumstances present here. Indeed, in this case, as in *McAbee,* the circumstances surrounding the negotiation of Modification 25 support a finding of complete integration. Here, as in *McAbee,* 97 F.3d at 1434, the parties expressly discussed a possible side agreement, and the contractor (in letters dated May 13, 1986 and May 28, 1986, both sent before the execution of Modification 25) specifically requested that the alleged side agreement be memorialized (stating in its letters during the contract negotiations that the "settlement is reflected *in part* in the Contract Modification" and requesting that the side agreement "be confirmed as soon as practical."). (J.A. 298, 300, 301, 303) (emphasis added). But Modification 25 as executed contained no reference to any side agreement and contained an explicit integration clause. Under such circumstances we held in *McAbee* that there was no basis for ignoring the integration

clause. 97 F.3d at 1434. Here, as in *McAbee,* the contractor "should have requested that the integration clause be stricken or modified if the agreement did not expressly address all of the issues on which the parties had agreed." *Id.*

We conclude that Modification 25 was an integrated document to which no additional terms could be added through parol evidence, and that it did not contain the unilateral promises allegedly made by the government. Accordingly, we reverse the Board's decision invalidating Modification 25 on the ground that the government breached the alleged side agreement, and remand for consideration of the contractor's other alleged grounds for invalidation of Modification 25.

## B. Modification 29

We reach a different result concerning the validity of Modification 29. We affirm the finding of duress.

■ To render a contract unenforceable for duress, the party "must establish that (1) it involuntarily accepted [the other party's] terms, (2) circumstances permitted no other alternative, and (3) such circumstances were the result of [the other party's] coercive acts." *Dureiko v. United States,* 209 F.3d 1345, 1358 (Fed.Cir.2000); *see also, e.g., United States v. Bethlehem Steel Corp.,* 315 U.S. 289, 301, 62 S.Ct. 581,

---

**3.** The Fourth Edition of the Williston treatise continues to recognize that "[p]erhaps most courts ... give presumptive effect to a merger clause," but also recognizes the existence of a "minority view" that "parol evidence can ... be examined to determine whether the contract is integrated, and to explain what the words used in the contract mean." Williston, *supra,* § 33:16. Of course, any ambiguities in an integration clause can be resolved by considering the surrounding circumstances. *United States v. Winstar Corp.,* 518 U.S. 839, 863, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

The Restatement also recognizes that the existence of an integration clause is "likely to

conclude the issue whether the agreement is completely integrated." *Restatement (Second) of Contracts,* § 216 cmt. e (1981); *see also* Calamari & Perillo, *supra,* § 3.6 (The rule "followed by most courts, is that a merger clause will ordinarily resolve the issue of total integration."); James J. White & Robert S. Summers, *Uniform Commercial Code* § 2–12 (4th Ed. 2000) (A merger clause "should be effective to preclude a judge from admitting extrinsic evidence on a theory that the writing is not a complete and exclusive statement of the contract terms.").

86 L.Ed. 855 (1942); *Liebherr Crane Corp. v. United States*, 810 F.2d 1153, 1158 (Fed. Cir.1987); *Sys. Tech. Assoc., Inc. v. United States*, 699 F.2d 1383, 1387 (Fed.Cir.1983).

In addressing the first two parts of this test, we have held that government coercion must have been the cause of the contractor's agreement.[4] Here, however, the government does not dispute that its withholding of progress payments caused the contractor to agree to Modification 29. The sole question, then, is whether the government's action was coercive.

▬▬▬ Our past decisions make clear in the procurement context proof of coercion requires proof of wrongful action by the government. For example, in *Johnson, Drake & Piper, Inc. v. United States*, our predecessor court emphasized that "[e]conomic pressure and even the threat of considerable financial loss are not duress." 209 Ct.Cl. 313, 531 F.2d 1037, 1042 (1976) (internal citation omitted). Rather, for a government action to be coercive, "[s]ome wrongful conduct must be shown." *Id.* at 1043. In other words, "[t]o render an agreement voidable on the grounds of duress it must be shown that the party's manifestation of assent was induced by an improper threat which left the recipient with no reasonable alternative save to agree." *David Nassif Assoc. v. United States*, 226 Ct.Cl. 372, 644 F.2d 4, 12 (1981) (internal citation omitted) (*Nassif II*). Illegal action by the government (that is, action in violation of a statute or regulation) can support a finding of duress. *Liebherr*, 810 F.2d at 1158; *Sys. Tech.*, 699

F:2d at 1387–88; *Nassif II*, 644 F.2d at 12; *Johnson, Drake & Piper*, 531 F.2d at 1042–43. However, an act can be coercive without being illegal. Government coercion may be supported by a finding that the government engaged in wrongful acts by violating the contract without a good-faith belief that its actions were justified or by violating the covenant of good faith and fair dealing implicit in every contract. In *Systems Technology*, this court observed that our precedent

> ha[s] done away with the requirement of an illegal act ... An act the government is empowered to take under law, regulation, or contract may nonetheless support a claim of duress if the act violates notions of fair dealing by virtue of its coercive effect.

699 F.2d at 1387–88. In summary, coercion requires a showing that the government's action was wrongful—*i.e.* that it was (1) illegal, (2) a breach of an express provision of the contract without a good-faith belief that the action was permissible under the contract, or (3) a breach of the implied covenant of good faith and fair dealing. *Sys. Tech.*, 699 F.2d at 1387–88; *Nassif II*, 644 F.2d at 12; *Johnson, Drake & Piper*, 531 F.2d at 1042–43.

▬▬▬ Here the contractor has shown the existence of a wrongful act. It is admitted that the contractor was in deep financial distress at the time Modification 29 was signed. The administrative contracting officer approved the progress payment based on the factors that the con-

---

**4.** In *Systems Technology*, we declined to find that delay in making an audit available by the government for five to six weeks amounted to coercion when there was no proof that the delay caused the contractor's financial distress. 699 F.2d at 1388–89. In *Liebherr Crane Corp.*, applying the rule from *Systems Technology*, we held that the Board of Contract Appeals' finding that there was no duress was supported by substantial evidence

when there was "no indication that [the contractor's] acceptance" was "involuntary," and its "predicament resulted from its own initial gross negligence." 810 F.2d at 1158. In *Dureiko*, we similarly found no duress where the contractor was in financial distress not because of action by the government but because of losses caused by a hurricane. 209 F.3d at 1358.

tract required be considered: "the best interest of the Gov't., the contract loss ... progress payments and cases accepted to date ... disallowances and Modification [29]." Nevertheless, the government withheld the progress payment, for the sole purpose of pressuring the contractor into signing Modification 29. The contract provided for the withholding of progress payments if the contractor

> (i) has failed to comply with any material requirement of this contract, (ii) has failed to make progress, or is in such unsatisfactory financial condition, as to endanger performance of the contract, (iii) has allocated inventory to this contract substantially exceeding reasonable requirements, (iv) is delinquent in payment of the costs of performance of this contract in the ordinary course of business, (v) has so failed to make progress that the unliquidated progress payments exceed the fair value of the work accomplished on the undelivered portion of this contract, or (vi) is realizing less profit than the estimated profit used for establishing a liquidation percentage in paragraph (b), if that liquidation percentage is less than the percentage stated in paragraph (a)(1).

The contract also allowed the government to withhold progress payments "during the time the contractor's accounting systems and controls are determined by the Government to be inadequate for segregation and accumulation of contract costs." The contract did not allow the government to withhold progress payments simply to pressure the contractor into giving up its rights under the contract. The government could not have had a good-faith belief that withholding for this purpose was permissible under the contract.

The government argues that the withholding of the progress payments was permissible because the contractor was in default or because the government in good faith believed that the contractor was in default. It is true that a good-faith withholding of the progress payment because the government believed the contractor's performance was deficient would not constitute duress. "[T]he assertion of a legitimate contract right cannot be considered as violative of a duty of good faith and fair dealing," and thus cannot be coercive. *Nassaf II*, 644 F.2d at 12. For example, in *Johnson, Drake & Piper*, "it [was] not duress to threaten to make good faith use of the remedies prescribed under a contract." 531 F.2d at 1043. The contracting officer simply told the contractor, in good faith, that termination was warranted and explained that the contractor's excuses were unavailing. The contractor ultimately agreed to a modification, and we upheld the Board's finding that the modification was not obtained by duress. *Id. See also Nassif II*, 644 F.2d at 12 (Board finding of lack of duress upheld when the government threatened non-performance "in the face of what it saw (and correctly so) as a repudiation by the [contractor] of a material part of the parties' bargain.").

■ But the wrongfulness of the government's action must be judged at the time it was taken. *Pigeon v. United States*, 27 Ct.Cl. 167, 175 (1892). Here, the Board found that the government withheld the progress payment not for a permissible reason, but simply to pressure the contractor into signing the modification. This finding is supported by substantial evidence. *See Freedom NY*, 01–2 B.C.A. (CCH) at 156,057. Whether styled as an unjustifiable breach of the contract's express terms or as a breach of the duty of good faith and fair dealing, the government's action was improper. The government cannot defeat a duress claim by an after-the-fact justification for an action that was taken for an improper purpose.

## III

The government's final basis for appeal, that the Board's decision was arbitrary and capricious because it conflicted with an earlier decision of the Board, is frivolous. The portion of the earlier decision relied on by the government was vacated by the Board because the contractor had not expected the issue of breach to be decided at that stage of the proceedings. *Freedom NY,* 96–2 B.C.A. (CCH) at 142,325. The government has not appealed the order vacating that portion of the earlier decision. Although it is true that the Board did not do a perfect job removing every fact on which the vacated part of the decision was based, its intent was unmistakable:

> We delete reference to docket number ASBCA No. 43965 from the caption of our 7 May 1996 opinion and in the "DE-CISION" section thereof; we vacate that portion of the decision denying ASBCA No. 43965; and we restore the appeal in ASBCA No. 43965 to our active docket.

*Id.* Given this intent, the Board's incomplete removal of the facts on which the vacated decision was based is irrelevant. The law of the case thus does not apply because "a vacated judgment 'has no preclusive force either as a matter of collateral or direct estoppel or as a matter of the law of the case.'" *U.S. Philips Corp. v. Sears Roebuck & Co.,* 55 F.3d 592, 598 (Fed.Cir.1995) (quoting *No E.–W. Highway Comm., Inc. v. Chandler,* 767 F.2d 21, 24 (1st Cir.1985)). Unlike a situation in which findings conflict within a single decision, *see Essex Electro. Eng'rs, Inc. v. Danzig,* 224 F.3d 1283, 1295 (Fed.Cir. 2000), the Board was free to come to different factual conclusions the second time around without revisiting its decision in the earlier vacated decision.

## IV

In its cross appeal, the contractor argues that the breaches by the government were so extensive as to constitute a cardinal change. A cardinal change "occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." *Krygoski Constr. Co. v. United States,* 94 F.3d 1537, 1543 (Fed.Cir.1996) (citations omitted); *AT&T Communications, Inc. v. Wiltel, Inc.,* 1 F.3d 1201, 1205 (Fed.Cir.1993); *Allied Materials & Equip. Co. v. United States,* 215 Ct.Cl. 406, 569 F.2d 562, 563–64 (1978). A cardinal change can occur even when there is no change in the final product because "it is the entire undertaking of the contractor, rather than the product, to which we look." *Edward R. Marden Corp. v. United States,* 194 Ct.Cl. 799, 442 F.2d 364, 370 (1971). The finding of a cardinal change is "principally a question of fact." *Allied Materials,* 569 F.2d at 565. The Board specifically found that the facts "d[id] not establish that appellant performed duties materially different from those originally bargained for and beyond the scope of the contract" and thus that there was no cardinal change. *Freedom NY,* 01–2 B.C.A. (CCH) at 156,540. Although the contractor does not contend that the Board erred in finding or declining to find any specific fact, it still takes issue with the Board's determination that there was no cardinal change. That too is a factual inquiry. "Even where underlying facts are established, the drawing of conclusions as to ultimate facts is still a fact-finding function." *Allied Materials,* 569 F.2d at 565.

We conclude that the Board's finding was supported by substantial evidence. The Board found that the government: (1) improperly denied, suspended,

and delayed making progress payments, *Freedom NY*, 01–2 B.C.A. (CCH) at 156,-061; (2) improperly interfered with the contractor's ability to obtain financing, *id* at 156,063; (3) diverted menu items, *id.*; (4) delayed delivery of menu items it was contractually obligated to deliver, *id.* at 156,064; (5) imposed improper inspections, *id.*, and (6) imposed improper testing requirements, *id.* It further held that all of these breaches merely constituted governmental delay, which was compensable under the contract. *Id.* at 156,067–68. We agree that the Board could properly find that these breaches did not constitute "an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." *Krygoski Constr.*, 94 F.3d at 1543.

■ The contractor also argues that the Board should have awarded anticipated profits and fixed overhead associated with future contracts which, it contends, it would have been awarded as an approved MRE-producer absent the government's breach of contract. It relies principally on *Locke v. United States*, 151 Ct.Cl. 262, 283 F.2d 521 (1960). That case, however, differs from this one. The government in *Locke* was obligated to purchase its requirements from the contractors it maintained on its approved list, and the contract itself required that the contractor be on that list. *Id.* at 522. The ~breach at issue in *Locke* was wrongfully removing the contractor from the approved list, with the result that the contractor was denied future contracts. *Id.* at 523–24. The Court of Claims held that, in such a situation, lost profits were neither remote nor speculative because the government's

breach directly resulted in the loss of future contracts. *Id.* at 525. Here, by contrast, the contractor does not assert that the contract entitled it to future contracts;[5] rather, it asserts that, absent the damage the government breaches did to its business, it would have been eligible for future contracts. Thus, its claim is not, as in *Locke*, for profits "such as would have accrued out of the contract itself, as direct and immediate results of its fulfillment," but rather for profits "such as would have been realized from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract." *Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1022–23 (Fed.Cir.1996) (citation omitted); *see also Olin Jones Sand Co. v. United States*, 225 Ct.Cl. 741, 743–44, 1980 WL 13211 (1980) (damages based on future contracts "too remote and speculative to be recoverable" when government wrongdoing caused contractor to lose bonding capacity and thus be unable to obtain contracts); *Rocky Mountain Constr. Co.*, 218 Ct.Cl. 665, 666, 1978 WL 8468 (1978) (damages based on future contracts "too remote, indirect and speculative to permit recovery" when absent government delay contractor would have been able to bid on other contracts). The Board here correctly held that such profits are too "remote and uncertain" to be recoverable.

We have considered the other points argued by the contractor and the government and find them to be without merit.[6]

### CONCLUSION

For the foregoing reasons, we affirm in part, reverse in part, and remand for fur-

---

5. We have held that there was no enforceable side agreement in connection with Modification 25 promising future contracts.

6. In light of our disposition of Modification 25, we do not address the contractor's claim

for interest dating from its certified claim of April 24, 1986. We note that it appears in any event that this claim was not properly raised below, and is thus foreclosed.

ther proceedings consistent with this opinion.

*AFFIRMED–IN–PART, REVERSED–IN–PART, AND REMANDED.*

### COSTS

No costs.