# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of --           )
                                 )

Relyant, LLC             )       ASBCA No. 58172
                                 )

Under Contract No. W91B4N-08-D-0011   )

| | |
|---|---|
| APPEARANCE FOR THE APPELLANT: | James H. Price, Esq.<br>Lacy, Price & Wagner, PC<br>Knoxville, TN |
| APPEARANCES FOR THE GOVERNMENT: | Raymond M. Saunders, Esq.<br>Army Chief Trial Attorney<br>Kyle E. Chadwick, Esq.<br>Trial Attorney |

## OPINION BY ADMINISTRATIVE JUDGE PROUTY ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT AND APPELLANT'S CROSS-MOTION

The government has filed a motion for summary judgment (govt. br.) in ASBCA No. 58172[1] arguing that this matter may be disposed of by what amounts to a straightforward application of the terms of the contract and its associated delivery orders that are at issue in this matter. In response, appellant filed its own cross-motion for summary judgment (app. br.) arguing that the relevant contract terms should be interpreted in its favor because the terms of the delivery orders that it agreed to were impermissible. Appellant also filed an opposition to the government's motion (app. opp'n) arguing that, at the very least, ambiguity in the contract terms precludes summary judgment in the government's favor and that other matters also preclude summary judgment for the government. Both parties filed reply briefs, and we requested additional briefing to clarify the parties' views of the amendments to two of the delivery orders. For the reasons stated herein, we conclude that the government's interpretation of the contract terms should prevail, and enter judgment in favor of the government.

---

[1] While ASBCA No. 58172 is consolidated with ASBCA No. 59809, the motion applies only to ASBCA No. 58172.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

### I. Introduction

1. On 22 September 2008, the Army awarded Contract No. W91B4N-08-D-0011 (contract) to Critical Mission Support Services, the predecessor-in-interest to Relyant, LLC (hereinafter Relyant or contractor). The contract is an indefinite-delivery/indefinite-quantity (IDIQ) contract for the manufacture, delivery, and installation of "relocatable buildings" (RLBs) for use in Afghanistan, which were to be constructed from retrofitted shipping containers (App. Statement of Genuine Issues of Material Fact (SGIMF) ¶ 1).[2] The contract included a Statement of Work (SOW), provided that delivery orders (DOs) would be issued and included a schedule setting forth prices for the RLBs and associated installation services (R4, tab 1). The contract also contemplated that multiple vendors possessing similar IDIQ contracts would be submitting bids to the contracting officer (CO) seeking to be awarded the various DOs (SGIMF ¶ 1). In fact, two additional vendors were awarded IDIQ contracts to provide RLBs at the same time that Relyant was awarded its contract (*id.*).

2. As will be seen herein, for four DOs that were awarded to Relyant, the parties agreed to a price for the RLBs and their installation that was smaller than the figure in the price schedule provided in the original IDIQ contract as amended. Although the Army paid Relyant the amount set forth in the DOs (as amended), Relyant now seeks payment at the higher price set forth in the original IDIQ contract (as amended).

### II. The Material Terms of the IDIQ Contract

3. The contract includes a numbered schedule of supplies and services (contract line item numbers (CLINs)) with associated "prices/costs" (R4, tab 1 at 1-2). Section H1 of the contract provides that, prior to awarding DOs, the CO will provide to all contractors a notice of intent to make a purchase (R4, tab 1 at 36). The section also requires that the CO "fairly consider offers" received in response to such notices and that, in making the awards, the CO was to "consider price and any other factors listed in the notice" (*id.*).

4. The contract also included the IDIQ Ordering clause contained in the Federal Acquisition Regulation (FAR) 52.216-18, ORDERING (OCT 1995), which is required to be in all IDIQ contracts (R4, tab 1 at 44). Included in this provision is paragraph (b), which provides that:

---

[2] Where Relyant concedes, in its "Statement of Genuine Issues of Material Fact," that one of the proposed findings in the government's "Statement of Undisputed Material Facts" is accurate, we may note it herein.

All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of a conflict between a delivery order or task order and this contract, the contract shall control.

(*Id.*)

### III. Orders on and Changes to the Contract

5. Contemporaneously with its award of the contract to Relyant on 22 September 2008, the government issued DO No. 1 (DO1) on the contract directing Relyant to produce, deliver, and install nine two-story RLBs for a total price based upon CLIN prices in the original contract schedule, $5,381,750.15 (nine times $551,124 for the manufacture of each plus nine times $46,848.24 for their installation) (R4, tab 4).[3]

6. The parties executed Modification No. P00001 to the contract (P00001) on 22 and 23 December 2008, which changed the SOW and increased the CLIN pricing schedule for the original contract (R4, tab 15 at 1-12). Neither the amended SOW nor the amended pricing schedule purported to retroactively apply to the RLBs ordered in DO1 (*id.*).

7. The Army issued both DO2 and DO3 on 24 December 2008 to Relyant (R4, tabs 17, 18). DO2 was for the manufacture and installation of one two-story RLB at Bagram Airfield (R4, tab 17 at 1-2). The price for DO2 corresponded to the now-amended CLIN price schedule in the original contract (agreed to in P00001), minus a five percent "discount" offered by Relyant (*id.* at 2). Thus, the order's price under the amended price schedule, of $997,036 ($858,965 for the manufacture of the RLB plus $138,071 for its installation), was marked down to $947,184.20 in this DO that was executed by both parties (*id.*). The executed order referenced no contingency for the discount (R4, tab 17).

8. DO3 was for manufacturing and installing two more two-story RLBs at Bagram Airfield (R4, tab 18 at 1-2). As in DO2, the price corresponded to that in the amended price schedule, minus the five percent "discount" offered by Relyant (*id.* at 2). Thus, the original price for the manufacture and installation of the two RLBs under the amended price schedule of $1,994,072 (two times $858,965 for their manufacture plus two times $138,071 for their installation), was marked down to $1,894,368.40 in this DO that was executed by both parties (*id.*). The executed order referenced no contingency for this discount (R4, tab 18).

9. Three days later, on 27 December 2008, the Army issued DO4, which, like DO3, was for the manufacture and installation of two more two-story RLBs at Bagram Air Field (R4, tab 19 at 1-2). The pricing of DO4 was identical to that of DO3: the amended contract's price schedule, subjected to a five percent "discount," leading to a

---

[3] DO1 miscalculated this price by 1¢.

price of $1,894,368.40 in this DO that was executed by both parties (*id.*). The executed order referenced no contingency for this discount (R4, tab 19).

10. Subsequent to the issuance of DO1, the parties recognized that DO1 had failed to make any allowance for the costs of delivering the RLBs from Bagram Airfield to other Forward Operating Bases (FOBs) in Afghanistan (the contract had a CLIN for delivery that had been left off of the DO) (R4, tab 9 at 1-4). Apparently, because of funding constraints, the number of RLBs provided by DO1 needed to be reduced in order to accommodate the added delivery costs (R4, tab 6 at 1 (Relyant noting that, absent increased funding, the number of RLBs would need to be reduced)). The parties also decided to "incorporate mechanical and window changes into CLIN 0002 unit pricing" (R4, tab 24 at 2). Thus, on 2 and 3 April 2009, the parties executed Modification No. 1 to DO1 that: (1) reduced the number of RLBs provided and installed by Relyant from nine to six; (2) increased the unit price for the manufacture of the RLBs to $615,551.06 and left the unit price for installation of the RLBs at $46,848.24;[4] and (3) added an unpriced CLIN (not to exceed $1,396,704) for transportation of the RLBs to the FOBs (*id.* at 1-3). After this modification, the total price of DO1 changed to $5,371,099.80 (*id.* at 3), compared to the DO's prior price of $5,381,750.15 (R4, tab 4 at 2).

11. On 27 August 2009 and 2 September 2009, the parties executed Modification No. 2 to DO3, changing the type of RLB from the two-story variety to the three-story type (R4, tab 64). This modification, signed by both parties, increased the price for the delivery order by $714,035.80, from $1,894,368.40 to $2,608,404.20 (*id.* at 2). The $714,035.80 price increase corresponded to the difference in price of the contract's CLINs (as amended by P00001) for the manufacture and installation of three-story RLBs compared to the manufacture and installation of two-story RLBs (R4, tab 15 at 2, 4, tab 62 at 2). Because this figure was added to the original DO3's discounted price for a two-story RLB, DO3's price for the three-story RLB remained less than the amended contract's price for three-story RLBs, although the net discount was proportionally less (approximately 3.7%, compared to the original 5%).

12. At the same time, the parties also issued a materially identical Modification No. 2 to DO4, changing the type of RLB from a two-story model to a three-story type (R4, tab 65). The prices in Modification No. 2 to DO4 were identical to those in DO3 as amended (R4, tab 64 at 2, tab 65 at 2).

13. Nine days later, on 11 September 2009, the parties executed a bilateral modification to the original contract (P00007) in which they agreed to incorporate changes into the SOW for the original contract and to amend the prices of several

---

[4] By contrast, the CLIN prices for manufacturing and installing two-story RLBs (with their modified SOW) in the original contract, as modified by P00001 three months earlier, were $858,965 and $138,071 respectively (SOF ¶¶ 6, 8).

4

CLINs (R4, tab 69). Of materiality to this motion, CLIN 0002 (for the manufacture of two-story RLBs) saw its unit price increase by $25,840 and CLIN 0003 (for the manufacture of three-story RLBs) had a unit price increase of $38,760 (*id.* at 2).

14. On the same day that the parties executed P00007, they executed related bilateral modifications to DOs 2, 3, and 4 (R4, tabs 70, 71, 72). For DO2, the parties added $25,840 to the price, consistent with the increased price of CLIN 0002 as modified by P00007 (R4, tab 70 at 2). For DO3, the parties added $77,520 to the price, consistent with the increased price of CLIN 0003 as modified by P00007 and multiplied by two, to account for there being two RLBs ordered by DO3 (R4, tab 71 at 2). And, finally, the modification to DO4 was materially identical to the modification to DO3, adding $77,520 to its price (R4, tab 72 at 2).[5] DO1 remained unchanged.

## IV. Payment on the Contract

15. The Army paid Relyant $662,399.31 ($615,551.06 for their manufacture and $46,848.25 for their installation) for each RLB provided under DO1 as modified in April 2009 (SGIMF ¶ 19). This is the amount that the parties agreed to (exclusive of delivery charges) in Modification No. 1 to DO1 (*id.*). The Army also paid Relyant the amounts set forth in DO2, DO3, and DO4 as amended by their 11 September 2009 modifications (SGIMF ¶¶ 20, 21, 22).

## DISCUSSION

The standards for summary judgment are well established and need little elaboration here. Summary judgment should be granted if it has been shown that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A non-movant seeking to defeat summary judgment by suggesting conflicting facts "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)).

Here, the primary dispositive issue is whether the price schedule set forth in the original contract (as modified) precludes the parties from negotiating and agreeing to different prices in the DOs. Relyant's position is that, regardless of what the parties mutually agree to in the DOs, they may not differ from the prices set forth in the contract's price schedule because the Ordering clause in the original contract requires that all differences between the contract and the DOs be resolved in favor of the original contract (app. br. at 8). The government argues that the contract permits the DO prices to be lower than those in the original contract schedule because it explicitly allows the different IDIQ

---

[5] Like the earlier modifications to DOs 3 and 4, the prices-as-modified continued to be lower than the prices contained in the original contract (as modified) because the price increases were added to the original "discounted" price.

5

contractors to submit bids on delivery orders with different prices (gov't br. at 8-9). We conclude that only the government position harmonizes all of the provisions of the contract and, not coincidentally, is consistent with the parties' pre-conflict actions, which reflect their intent. Appellant's interpretation, on the other hand, is unreasonable. We further conclude that the other defenses against summary judgment articulated by Relyant do not present disputed facts that preclude judgment in favor of the government.

I. The Proper Interpretation of the Contract Allows the Parties the Right to Mutually Agree to Lower Prices for the DOs than Those in the Original Contract's Price Schedule

Under basic principles of the law, a contract is interpreted "in terms of the parties' intent, as revealed by language and circumstance." *United States v. Winstar Corp.*, 518 U.S. 839, 911 (1996) (citations omitted). Generally, this process begins and ends with the language of the contract. *TEG-Paradigm Environmental, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006). And in reviewing this language, the Board should read the contract "as a whole and [interpret it] to harmonize and give reasonable meaning to all its parts," if possible, leaving no words "useless, inexplicable, inoperative, insignificant, void, meaningless or superfluous." *Precision Dynamics, Inc.*, ASBCA No. 50519, 05-2 BCA ¶ 33,071 at 163,922; *see also Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002) ("contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract"); *Hunkin Conkey Constr. Co. v. United States*, 461 F.2d 1270 (Ct. Cl. 1972) (rejecting contract interpretation that would render a clause in the contract meaningless). Interpreting the contract as a whole requires the Board to interpret all documents that are part of the same transaction together. *See* RESTATEMENT (SECOND) OF CONTRACTS § 202(2).

With these foundational tenets in mind, we turn to the contract at hand. To be sure, the price schedule in the original contract, read by itself, could lead the casual reviewer to believe that it sets the only prices that may be paid by the government for the CLINs covered by the contract. This is Relyant's favored interpretation. But this interpretation would be in tension with Section H1 of the contract, which allows the contractors to make competitive bids for DOs and for the CO to consider the price when deciding to which contractor it would award each DO (*see* SOF ¶ 3). If the price schedule in the contract were not subject to change by mutual agreement of the parties in the DOs, there would be little point in the competitive bidding contemplated by clause H1.[6] Moreover, this interpretation would also be in direct conflict with the DOs that

---

[6] Indeed, one of the significant benefits of a multiple award IDIQ contract, like the one here, is that the continuing competition for the award of DOs allows the government the opportunity to control the prices of individual DOs. *See* JOHN CIBINIC, JR. & RALPH C. NASH, JR., FORMATION OF GOVERNMENT CONTRACTS 1243 (3d ed. 1998), *see also id.* at 1249, 1251 (referencing competitive pricing of individual delivery orders).

6

were negotiated and executed by both of the parties, which set forth lower prices than the original contract's price schedule and (being a part of the contract), must be considered in harmonizing the meaning of the contract. Under Relyant's interpretation, the prices that the parties agreed to in the DOs would have been utterly meaningless. This is a disfavored interpretation and cannot constitute an accurate reflection of the parties' intentions: just what were the parties doing when they were executing their DOs if the reduced pricing was unallowable? Tellingly, in none of its four filings related to this motion, does Relyant provide any explanation of how, under its interpretation of the contract, clause H1 or the DOs' terms would not be superfluous, nor does it offer any means to harmonize them with the original contract's price schedule.

The government must, of course, provide a reasonable explanation for the existence of the pricing schedule in the original contract and why *its* terms are not superfluous if they are subject to alteration by the DOs. The government has suggested that this pricing schedule reflects a maximum price permissible by the contract (gov't reply at 4). Although no terms of the contract use this express language, we believe it to be a reasonable interpretation of the contract, which has the virtue of harmonizing all of the terms of the contract and being consistent with the intent of the parties as evidenced by the DOs. *See Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982) (contemporaneous construction of an agreement prior to dispute is entitled to great weight). It is also consistent with the public policy interest of fostering price competition in the original award of the multiple IDIQ contracts (by requiring the parties to bid a ceiling price) while continuing to allow for price competition in the DOs.

Relyant argues that the order of precedence portion of the Ordering clause would be superfluous under the government's preferred interpretation of the contract (app. opp'n at 10-11), but that is not so. The clause is simply not applicable when there is no conflict in the contract and DO terms, and there is no such conflict here. There are many other potential contingencies in which the terms of a DO could conflict with the contract as we interpret it here (e.g., if the DO's prices exceeded the ceiling prices in the original schedule), making the order of precedence clause a necessary provision. Put another way, application of the order of precedence clause is only necessary if there is a conflict in the contract's terms; the proper interpretation of this contract (which permits the parties to mutually agree to lower prices in the DOs than in the original schedule) avoids such a conflict.

The government also argues, in the alternative, that, if its view of the contract is incorrect, then the contract's terms would have presented a patent ambiguity, which would have required Relyant to make an inquiry about their meaning (gov't reply br. at 5). Because we find that our interpretation of the terms of the contract is internally-consistent and removes any ambiguity, the doctrine of patent ambiguity does not apply.

7

## II. Relyant's Additional Arguments Do Not Challenge the Viability of the DOs

Relyant makes a number of additional undeveloped arguments that the DOs, as amended, should be invalid. One of these arguments is made explicitly in the "Argument" section of its opposition to the government's motion; the others are sprinkled throughout the "Factual and Procedural Background" section of its opposition brief. All but one of these arguments are contained in a single legally-conclusory paragraph of the declaration of its Vice President of Business Development, Kenneth Biles. None are persuasive.

Relyant's only additional argument that is fully developed and included in its "Argument" section is that the government should not be entitled to the five percent discounts reflected in the pricing for DOs 2, 3, and 4 because the government's modification of RLB requirements after First Article Testing of the RLB's deprived it of the economies of scale necessary to support the "discount" (app. opp'n at 12-14; Biles decl. ¶¶ 14-15). As the government rightly points out, the final DOs, as amended by their change orders, made no reference to any discount (R4, tabs 70, 71, 72), and even the original DOs' discounts were not contingent upon such economies of scale (SOF ¶¶ 7-9). Thus, whatever contingencies may have been considered when Relyant first proposed the five percent discount to the government were overtaken by the DOs and their amendments, which made no mention of such considerations and did not make the DOs contingent upon any factors involving economy of scale.

Relyant alleges in a single paragraph of the "Factual and Procedural Background" of its opposition brief that the terms of the first modification to DO1 should be void because they were entered under duress[7] (app. opp'n at 4). The total factual support for this legal conclusion in Relyant's filing consists of the following language in Mr. Biles's declaration:

> Modification #01 to DO #0001 also included an additional line item making shipping costs part of the Government's order, which both Relyant and the Government agreed should have been included in the original delivery order. Because Relyant needed to be reimbursed by the Government for shipping as had originally been contemplated, Relyant agreed to Modification #01 to DO #0001 even though it contained inconsistent pricing terms and even though it contained a release of claims clause. Based on the circumstances and the Government's constantly changing demands with regard to

---

[7] This allegation was not presented in Relyant's complaint or claim, and Relyant does not extend it to the terms of DOs 2, 3, or 4.

> RLB specifications and other issues, Relyant agreed to
> Modification #01 to DO #0001 under economic duress.

(Biles decl. ¶ 7) Like the single paragraph in Relyant's response brief raising this defense, this declaration names a defense (a defense raised here for the first time in this litigation) and makes generalized references to some of its elements, but is nowhere near sufficient to preclude summary judgment.

As discussed above, a non-movant seeking to defeat summary judgment by suggesting conflicting facts "must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 248 (quoting *First National Bank of Arizona*, 391 U.S. at 288-89). In order to prevail on an economic duress defense, a party must allege and prove that it (1) involuntarily accepted the other party's terms; that (2) circumstances permitted no other alternative; and (3) such circumstances were the results of the other party's coercive acts. *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1329 (Fed. Cir. 2003). Mr. Biles's declaration does not set forth facts supporting a single element of the defense, even though it would need facts supporting all three in order to be effective: nowhere, except perhaps by implication, does he allege that Relyant's agreement to the terms of the modification to DO1 was involuntary; nowhere does he present any facts explaining why the circumstances presented no alternative to agreeing to the modification that he now alleges was improper; and nowhere does he allege any coercive acts by the government. Thus, there are no facts supporting the defense of economic coercion that preclude summary judgment.

The next argument advanced by Relyant in its "Factual and Procedural Background" section is that the amendments to DO1 are invalid because they lowered its price and thus lacked consideration (app. opp'n at 4; Biles decl. ¶ 7). This is not a serious argument: as the government points out, the amendment to DO1 lowered the overall price of the DO because it reduced the number of RLBs ordered (SOF ¶ 10). It also increased the unit price of the RLBs that it was obtaining (*id.*). This easily passes the (low) bar for consideration, which can be met by a bargained-for mutual exchange of promises. *See* RESTATEMENT (SECOND) OF CONTRACTS §§ 71, 72 (1981).

Relyant's next argument in this section is that it should be excused from the terms of DO1 because the government allegedly did not perform its end of the deal by making payment for shipping costs (app. opp'n at 4; Biles decl. ¶ 7). A claim for unpaid transportation costs is not presently before the Board. In any event, this alleged breach of the contract would not change the terms of the contract that are before us here: what Relyant is due for its manufacture and installation of the subject RLBs.

The last argument raised by Relyant in this section that we address is Relyant's contention that the amendments to the original contract's pricing schedule that were effected by P00007 should have been applied to DO1, just as these changes were applied

(through amendment) to DOs 2, 3, and 4 (app. opp'n at 5). But since, as discussed above, the price schedule in the original contract does not preclude the parties from agreeing to a lower number in DOs on that contract, there is no reason that P00007 should have necessarily applied to DO1. Indeed, the fact that the parties amended DOs 2, 3, and 4 concurrently with their adoption of P00007 indicates that they recognized that changing the price schedule in the original contract was not enough to change the prices in the DOs (thus, lending even more support to the interpretation of the contract that we set forth above), while their decision not to amend the pricing in DO1 indicates that they had agreed that DO1 need not have its prices changed. There was, moreover, a sensible reason for the parties to have left DO1's prices unchanged, which was that its SOW appears to have been unchanged, unlike the change to the SOW for DOs 2, 3, and 4.

### III. The Army Paid Relyant the Amount Specified by the DOs as Amended

Relyant does not dispute the fact that the Army paid it the amount to which it was entitled under the prices memorialized in the final amended versions of the DOs executed by both parties. Thus, there is no breach in this case, and the government is entitled to judgment in its favor.

### CONCLUSION

For the reasons stated herein, we grant summary judgment in favor of the government. ASBCA No. 58172 is denied.

Dated: 12 January 2016

J. REID PROUTY
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58172, Appeal of Relyant, LLC, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

11