# United States Court of Appeals for the Federal Circuit

2006-5054, -5057

NORTH STAR STEEL CO.,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

Philip L. Chabot, Jr., McCarthy, Sweeney & Harkaway, P.C., of Washington, DC, argued for plaintiff-cross appellant.

J. Reid Prouty, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; and Donald E. Kinner, Assistant Director.

Appealed from: United States Court of Federal Claims

Judge Susan G. Braden

# United States Court of Appeals for the Federal Circuit

2006-5054, -5057

NORTH STAR STEEL CO.,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

DECIDED: February 13, 2007

Before SCHALL, LINN, and DYK, <u>Circuit Judges</u>.

SCHALL, <u>Circuit Judge</u>.

The United States appeals the final decision of the United States Court of Federal Claims awarding North Star Steel Co. ("North Star") damages in the amount of $1,521,626 for the government's breach of a contract between Arizona Electric Power Cooperative Inc. ("AEPCO") and the Department of Energy's Western Area Power Administration ("WAPA"), North Star being an acknowledged third party beneficiary of the contract. <u>N. Star Steel Co. v. United States</u>, 68 Fed. Cl. 672 (2005). For its part, North Star cross-appeals, arguing that the Court of Federal Claims erred in computing the damages to which it was entitled. Because the court did not apply the proper legal standard for breach of contract, and because the court's findings of fact, which were made following a trial, do not support its holdings that WAPA breached its contract with

North Star and that North Star entered into an amendment to the contract under duress, the judgment in favor of North Star is reversed.[1] The case is remanded to the Court of Federal Claims, which is instructed to enter judgment in favor of the United States and to dismiss North Star's Second Amended Complaint. In view of our decision, it is not necessary for us to reach North Star's cross-appeal.

BACKGROUND

I.

The pertinent facts are not in dispute. WAPA is one of four power marketing administrations within the U.S. Department of Energy. As such, it markets and delivers cost-based hydroelectric power and related services within a 15-state region of the central and western United States. WAPA markets and transmits electricity from multi-use water projects. WAPA's transmission system carries electricity from 57 power plants operated by the Department of the Interior's Bureau of Reclamation, the U.S. Army Corps of Engineers, and the International Boundary and Water Commission. By statute, the rates WAPA charges in selling power must be at least sufficient to recover the costs associated with its operations, maintenance, and the federal construction investment. 43 U.S.C. § 485h(c). WAPA is in the business of moving power, as well as marketing it, and accordingly maintains an electrical transmission system and power "control areas." A power control area is a bounded subsystem within the larger national power grid within which electrical power levels are maintained at a level equaling their

---

[1]     As noted, North Star was a third party beneficiary of the contract between AEPCO and WAPA. Under these circumstances, and in the interest of clarity, unless the context requires otherwise, we refer to North Star as the party contracting and dealing with WAPA.

demand. If power changes within a control area as a result of a change in demand, the power supply must be increased or decreased to match the level of demand. This adjustment of power supply to meet changing demand is known as "regulation." N. Star Steel, 68 Fed. Cl. at 679 n.5. The Federal Energy Regulatory Commission ("FERC") has exclusive jurisdiction to "confirm, approve, and place in effect on a final basis," and "to remand[] or to disapprove," WAPA's power rates. See Delegation Order for Approval of Power Marketing Administration Power and Transmission Rates, 48 Fed. Reg. 55,664, 55,664-65 (Dec. 14, 1983).

At the relevant time, North Star was a manufacturer of steel products. In the early 1990s, it built a recycling mill near Kingman, Arizona that manufactured steel rod and bar. North Star Steel, 68 Fed. Cl. at 679-80. This facility, which was located within one of WAPA's control areas, used two electric arc furnaces in the manufacturing process. These furnaces required large amounts of electricity to recycle scrap steel into new steel products. Id. at 680. At the time, WAPA was not authorized to sell firm power[2] to North Star because WAPA previously had committed all such power to statutory preference customers in the relevant power control area. These preference customers were municipalities and public corporations and agencies, as well as cooperatives and other nonprofit organizations financed in whole or in part by loans made pursuant to the Rural Electrification Act of 1936. Id. Consequently, North Star entered into agreement with AEPCO and Mohave Electric Cooperative, Inc. ("Mohave

---

[2] "Firm power" is electric energy which is intended to have assured availability to the customer to meet all or any agreed portion of his load requirements. N. Star Steel, 68 Fed. Cl. at 677 n.2. It is power which is guaranteed by the supplier to be available at all times. Id.

Electric") to provide appropriate amounts of non-firm power, required to serve the North Star load at the Kingman mill.[3] Id. at 680-81. AEPCO is a generation and transmission cooperative organized under the Department of Agriculture's Rural Utility Service Administration. It is engaged in the generation of electric power and energy primarily in the State of Arizona. Mohave Electric is an Arizona generation and transmission cooperative eligible to purchase power and other services from WAPA.

WAPA owned the only transmission lines in the geographic area of Kingman with sufficient voltage to satisfy North Star's electric power requirements. Id. at 680. Therefore, AEPCO sought to obtain non-firm transmission services for the North Star load over WAPA's transmission lines. WAPA was willing to furnish this service to the extent capacity was available in its lines. In due course, AEPCO, Mohave Electric, and North Star entered into several contracts. In brief, the contracts provided that North Star would gain access to power lines with sufficient capacity to service its steel mill through Mohave Electric; Mohave Electric in turn would obtain power services from AEPCO; and AEPCO, working as an agent for North Star, would use WAPA transmission lines to obtain the actual power used to operate the steel mill from outside of WAPA's control area. Id. at 680-81. This suit involves only one of the several contracts, the Consolidated Arrangements Contract ("CAC").

---

[3] "Non-firm power" is power that may be interrupted for any reason at any time. N. Star Steel, 68 Fed. Cl. at 677 n.2. A "load" is an end-use device or customer that receives power from a power transmission system. Id. at 682 n.9.

The CAC was entered into on August 17, 1994, between WAPA and AEPCO for the benefit of North Star. Id. at 681. Under the CAC, WAPA agreed to provide both non-firm transmission service, CAC § 6 (entitled "Non-Firm Transmission Service to be Provided to AEPCO by [WAPA]"), and regulating services, CAC § 14 (entitled "Control Area and Regulating Services"), for North Star's load. For North Star's benefit, AEPCO agreed to pay for the transmission services in accordance with the standard FERC-approved rate schedule. CAC § 7 (entitled "Charges for Non-Firm Services").

WAPA, however, had technical concerns about being able to provide regulating services to meet North Star's load requirements.[4] For this reason, WAPA negotiated for a provision in the CAC that the regulating services to be provided to North Star would be made and paid for pursuant to an ad hoc methodology utilizing an in-kind energy payment, which would be in addition to the FERC-approved transmission rate schedule. N. Star Steel, 68 Fed. Cl. at 682-83. The methodology provided that North Star, through AEPCO, would provide energy to WAPA in the amount of twenty percent of the metered load from North Star:

---

[4]    The Kingman mill used powerful pulses of electricity to melt scrap metal in order to produce steel products. WAPA was concerned about the large fluctuations of the load resulting from the cyclical process of the arc furnaces melting scrap metal, then not melting, then melting again. N. Star Steel, 68 Fed. Cl. at 682. The Court of Federal Claims noted that the load variation for a typical WAPA wholesale customer was in the range of 6 MW, while North Star's load variation was in the range of 85 MW. Id. WAPA also was concerned about the arc that was striking during the melt cycle of the furnaces, appearing to the WAPA control system to be a near short circuit in the system. Id. Finally, WAPA's facilities used hydrounits to regulate the North Star load. Id. Because the hydrounits would respond to fluctuations in the load, and because hydrounits have a very fast response time compared to traditional thermal units, WAPA was concerned that the variability inherent in the arc furnace process would create exceptional wear and tear on the hydrounits. Id.

> [WAPA] shall receive In-Kind Energy from AEPCO for service rendered in connection with the North Star Load in the amount of Non-Firm Energy equal to twenty percent (20%) of the actual metered Non-Firm Energy to serve the Harris Substation hourly metered load measured in megawatthours (MWh). The In-Kind Energy payment can be received by [WAPA] from (i) the Non-Firm Energy in excess of the hourly integrated North Star Load in MWh, (ii) the Return Energy scheduled by [WAPA] to support the North Star Load when [WAPA] elects, on an hourly basis, to make Return Energy available, or (iii) subsequent Non-Firm Energy schedules from AEPCO, if required.

CAC § 14.3. The CAC further provided that the parties would revisit this part of the charge for regulation services at a later time:

> Prior to the conclusion of the first year of normal operations of the North Star Plant, the parties shall jointly establish an appropriate cost-based methodology to review, evaluate, and periodically, if necessary, adjust the percentage associated with the In-Kind Energy payment. After one (1) year of normal operations, the percentage may be adjusted in accordance with said methodology.

CAC § 21.

## II.

North Star's steel mill began commercially operating on July 1, 1997. N. Star Steel, 68 Fed. Cl. at 683. From October 23, 1997, to September 15, 1999, WAPA, AEPCO, and North Star engaged in negotiations under section 21 of the CAC to arrive at "an appropriate cost-based methodology" for the in-kind energy payment. No agreement was reached, however. Id. at 683-89. During the negotiations, WAPA presented several proposed methodologies to calculate charges associated with regulating services. WAPA's first proposal attempted to capture "replacement costs," i.e. unit specific costs that could be directly associated with regulating the North Star load. Id. at 684. Subsequently, WAPA attempted to obtain replacement costs from the

Bureau of Reclamation.[5]  Id.  WAPA discovered that the Bureau of Reclamation did not keep data in a manner that reflected replacement costs.  Id.  WAPA next determined that an approach based upon the incremental costs associated with possible fluctuations in North Star's load and any resulting stress that the fluctuations imposed on WAPA's equipment and system was not feasible.  WAPA then sought to create a methodology that relied on a proxy for replacement costs based upon the costs of an alternative service provider.  Id.  Between January 13, 1998, and June 2, 1998, WAPA provided several proposed methodologies to AEPCO and North Star.   Id. at 684-85.  On June 2, 1998, just prior to the conclusion of the first year of operations at the Kingman mill, WAPA informed North Star that if there was no agreement on a revised methodology by July 1, 1998, the in-kind energy payment of twenty percent would remain in effect.  Id. at 685.  On June 5, 1998, North Star advised WAPA that it believed that the proposed methodology included charges which were not within the purview of section 21 of the CAC and that WAPA's calculation of the cost of the regulation services was "grossly excessive."  Id.

In spite of their inability to reach agreement within the first year of normal operations, WAPA, North Star, and AEPCO continued to negotiate with respect to a new methodology.  Id. at 685-89.  On June 3, 1999, a meeting took place to discuss WAPA's proposal to add Amendment No. 3 to the CAC.  Id. at 688.  Amendment No. 3

---

[5]     The power plants containing the hydroelectric units producing the power necessary to regulate the North Star load were operated by the Bureau of Reclamation, the U.S. Army Corps of Engineers, and the International Boundary and Water Commission.  WAPA and its energy-producing partners are separately managed and financed.  WAPA Home Page, http://www.wapa.gov/ (follow "About Western" hyperlink).  In addition, each water project maintains a separate financial system and records.  Id.

replaced subsection 14.3 of the original CAC with a new subsection 14.3 which stated as follows: "The percentage of the actual metered Non-Firm Energy shall be determined in accordance with the methodology in effect and as provided and set forth in Exhibit H."[6] Amendment No. 3 § 4 (entitled "Modification of Section 14 of the Original Contract (Control Area and Regulating Services)). Exhibit H set forth a new methodology for calculating the in-kind energy payment. Amendment No. 3 Exhibit H (entitled "Regulating Service Arrangements for North Star Steel Plant"). On July 29, 1999, North Star authorized AEPCO to accept Amendment No. 3 and to amend the CAC under protest. N. Star Steel, 68 Fed. Cl. at 688-89. North Star's counsel sent AEPCO a letter on that date stating "North Star's view that none of the proposals put forth by [WAPA] are truly cost-based and that all are unreasonable. The current charge is so excessive, however, that even an unreasonable lesser charge is preferable to the continuation of the charge at the existing level." Id. at 689 (alteration in original). On September 15, 1999, WAPA and AEPCO, on North Star's behalf, signed Amendment No. 3, effective retroactively to August 1, 1999. Id. Amendment No. 3 did not provide

---

[6] The full revised subsection 14.3 stated:

[WAPA] shall receive In-Kind Energy from AEPCO for services rendered in connection with the North Star Load in the amount of Non-Firm Energy equal to a percentage of the actual metered Non-Firm Energy used to serve the Harris Substation hourly metered load measured in megawatthours (MWh). The percentage of the actual metered Non-Firm Energy shall be determined in accordance with the methodology in effect and as provided and set forth in Exhibit H. The In-Kind Energy payment can be received by [WAPA] from (i) the Non-Firm Energy in excess of the hourly integrated North Star Load in MWh, (ii) the Return Energy scheduled by [WAPA] to support the North Star Load when [WAPA] elects, on an hourly basis, to make Return Energy available, or (iii) subsequent Non-Firm Energy schedules from AEPCO, if required.

for a retroactive "true-up" of all amounts already paid, a provision which North Star had sought.[7] Id.

III.

On April 27, 2000, North Star filed suit in the Court of Federal Claims, alleging that WAPA had breached the CAC. In its suit, North Star sought, among other things, monetary damages in the form of a refund for what it asserted were overcharges by WAPA arising out of the methodologies WAPA used to determine in-kind payments. Subsequently, North Star filed a First Amended Complaint, in which it sought a declaration that the amount it was required to pay for WAPA control area and regulating services from the date of initial operation on July 1, 1997, to March 2003 violated the CAC, violated various federal statutes, and was arbitrary, capricious, and an abuse of discretion and not otherwise in accordance with law. The Court of Federal Claims granted the government's motion for summary judgment on the claims in the First Amended Complaint, agreeing that neither the CAC nor the cited federal statutes required that WAPA charge only "actual costs" for regulating services under the CAC. See N. Star Steel Co. v. United States, 58 Fed. Cl. 720, 735-38 (2003). The court, however, granted North Star leave to file a Second Amended Complaint to state precisely the nature of its breach of contract claim. In its Second Amended Complaint, North Star alleged that the CAC required a cost-based methodology for calculating the in-kind energy payment and that the failure to come to agreement on a new rate

---

[7] A "true-up" would have provided a retroactive adjustment of the amounts paid by North Star for regulating services, refunding to North Star the difference between what it paid and what it would have paid pursuant to the revised cost-based methodology.

structure until more than two years after the timeframe set forth in the contract constituted a breach of the CAC by WAPA. In addition, North Star appeared to allege that it had signed Amendment No. 3 to the contract under duress.

In November of 2004, the Court of Federal Claims conducted a trial in which it received documentary evidence and heard testimony from six North Star witnesses, four government witnesses, and a court-appointed expert. Thereafter, the court issued an opinion. The court held at the outset that it had jurisdiction over North Star's suit under 28 U.S.C. § 1491(a)(2) because the suit involved a claim arising under section 10(a)(1) of the Contract Disputes Act of 1978 ("CDA"). N. Star Steel, 68 Fed. Cl. at 696.

Turning to the merits, the court addressed first North Star's breach of contract claim. Framing the issue, the court stated that "the requirement of establishing a 'cost-based methodology' provides a clear demarcation by which the court can determine whether and when a breach occurred." Id. at 698. "Accordingly," the court continued, "the [CAC] could be breached if a 'cost-based methodology' was not utilized by WAPA or if one of the parties failed to negotiate in good faith." Id. The court went on to hold that WAPA had breached the CAC by failing to establish a cost-based methodology:

> In light of the fact that WAPA did not produce or introduce WAPA cost data to establish whether the regulating services provided to North Star, in fact, were "cost-based" and expert testimony confirmed that WAPA did not establish a rate for regulating services that was "cost-based" on July 1, 1998 or thereafter, the court has determined that there is substantial evidence in the record in this case that WAPA, in fact, breached the [CAC].

Id. at 721.

The Court of Federal Claims began its analysis of the duress issue by noting that a finding of economic duress requires "that (1) the party alleging duress involuntarily accepted another party's terms, (2) the circumstances permitted no other alternative,

and (3) such circumstances were the result of another party's coercive actions." Id. at 722 (citing Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1329 (Fed. Cir. 2003)). With the issue thus framed, the court determined that North Star had involuntarily accepted Amendment No. 3, satisfying the first prong of the duress test. Id. The court also determined that the second prong of the test was satisfied because the circumstances permitted North Star no alternative other than to accept Amendment No. 3. Id. Additionally, the court noted that WAPA owned and controlled the sole transmission line to North Star, that no other regional utilities offered regulation services at the time that met WAPA's technical requirements, that North Star had $5 million in embedded costs from building a switching station to connect to WAPA, and that North Star needed a reliable source of power. Id. As far as the third prong of the duress test was concerned, the court noted that "coercion requires a showing that the Government's action was wrongful, i.e., '(1) illegal, (2) a breach of an express provision of the contract without a good-faith belief that the action was permissible under the contract, or (3) a breach of the implied covenant of good faith and fair dealing.'" Id. (citing Freedom NY, 329 F.3d at 1330). The court found that the third prong of the duress test was satisfied because its court-appointed expert provided substantial evidence that Amendment No. 3 was not "cost-based." Id. Accordingly, the court held that "WAPA's unilateral imposition of Amendment No. 3 on North Star on September 15, 1999 was an act of 'economic duress' and a breach of the obligation to negotiate in good faith." Id. at 723.

In establishing the proper amount of damages, the court determined that North Star had paid WAPA the voluntarily negotiated first year rate set forth in the CAC and that therefore no injury occurred until August 1, 1999, the effective date of Amendment

No. 3.  Id.  The court awarded North Star damages in the amount of $1,521,626 for the period thereafter.  Id.

The government appeals the Court of Federal Claims' decision that WAPA breached the CAC and that Amendment No. 3 was signed by North Star under duress. North Star in turn cross-appeals the Court of Federal Claims' decision that North Star was not entitled to a retroactive "true-up" of costs under the contract.  It also argues in connection with the damages issue that the Court of Federal Claims violated North Star's constitutional right to a fair trial by unlawfully shifting the burden of production during trial.  We have jurisdiction over the appeal and cross-appeal pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

I.

As a preliminary matter, we address the jurisdiction of the Court of Federal Claims.  As noted, the court ruled that it had jurisdiction under the CDA pursuant to 28 U.S.C. § 1491(a)(2).  Both parties urge that this was incorrect because the CDA does not apply to a contract, such as the CAC, involving the provision of services by the government.  Rather, as far as services are concerned, the CDA only applies when the government is the acquiring party.  The parties are correct.  The CDA applies to contracts entered into by an executive agency for:  (1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair or maintenance of real property; or (4) the disposal of personal property.  41 U.S.C. § 602(a); see also Fla. Power & Light Co. v. United States, 307 F.3d 1364, 1371 (Fed. Cir. 2002).  The CDA does not apply to the CAC

because it was a contract for the provision of services <u>by</u> the government. Nevertheless, jurisdiction properly lay in the Court of Federal Claims under the Tucker Act, 28 U.S.C.A. § 1491(a)(1), which provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

Because North Star's claim arose out of the CAC, an express contract with the United States, the exercise of jurisdiction by the Court of Federal Claims was proper under the Tucker Act.

## II.

Turning to the merits, as noted, the government appeals both the ruling that WAPA breached the CAC and the ruling that North Star agreed to Amendment No. 3 to the contract under duress, while North Star cross-appeals the Court of Federal Claims' damages determination. In reviewing a decision of the Court of Federal Claims, this court reviews conclusions of law, such as contract interpretation, de novo. <u>Trauma Serv. Group v. United States</u>, 104 F.3d 1321, 1325 (Fed. Cir. 1997). Findings of fact made by the Court of Federal Claims following a trial are reviewed under the "clearly erroneous" standard. <u>City of El Centro v. United States</u>, 922 F.2d 816, 819 (Fed. Cir. 1990). We address the breach issue first.

## III.

The government argues that the Court of Federal Claims erred by finding a breach of contract based solely on WAPA's failure to use a cost-based methodology. According to the government, in order to prove that WAPA breached the CAC, North

Star was required to prove that WAPA negotiated in bad faith. The government contends that the facts found by the Court of Federal Claims, which the government does not challenge, do not support a determination of bad faith and therefore do not establish breach of the CAC. North Star responds that WAPA violated the requirement of section 21 of the CAC by developing a non-cost-based methodology and that the evidence is sufficient to support a conclusion that WAPA did not act in good faith in developing its methodology.

We agree with the government. Section 21 of the CAC provided that North Star and WAPA would "jointly establish an appropriate cost-based methodology." This court has recognized that a provision which calls upon the parties to a contract to agree in the future on a specified point or contract term, often referred to as an "agreement to agree," imposes an obligation on the parties to negotiate in good faith. See Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991); see also Gardiner, Kamya & Assocs. v. United States, 369 F.3d 1318, 1322 (Fed. Cir. 2004); City of Tacoma v. United States, 31 F.3d 1130, 1132 (Fed. Cir. 1994). Therefore, the correct standard for determining whether WAPA or North Star breached section 21 of the CAC was whether either party failed to negotiate in good faith with respect to an appropriate cost-based methodology.

It does not appear that the Court of Federal Claims employed this standard. As noted above, the court stated that the CAC would be breached if one of the parties failed to negotiate in good faith or "if a 'cost-based methodology' was not utilized by WAPA." N. Star Steel, 68 Fed. Cl. at 721. The court correctly stated that a breach of contract would occur if one of the parties to the CAC failed to negotiate in good faith.

However, it erred in positing in the alternative, without qualification, that WAPA would breach the contract if it failed to utilize a cost-based methodology. Failure on the part of WAPA to utilize a cost-based methodology would not, standing alone, amount to a breach of contract. Such failure would represent a breach of contract only if it was the result of WAPA's failure to negotiate in good faith. An example of conduct that would constitute a failure to negotiate in good faith would be WAPA's non-disclosure during negotiations of information in its possession, or to which it had access, that was pertinent to the formulation of a cost-based methodology. The point is that the failure to utilize a cost-based methodology, without more, could not constitute a breach of contract on WAPA's part. The reason is that section 21 of the CAC obligated WAPA to negotiate in good faith for a cost-based methodology. It did not obligate WAPA to employ a cost-based methodology if development of such a methodology did not prove feasible.

Moreover, the Court of Federal Claims' findings of fact do not support a determination of breach under the correct standard because there was no finding of bad faith on the part of WAPA. In concluding that WAPA had breached the contract, the court relied first on its finding that during negotiations and discovery, and at trial, WAPA claimed that the Bureau of Reclamation did not have data that would enable the government to determine whether the compensation WAPA received for its sale of regulating services to North Star was sufficient to cover the portion of its annual operation and maintenance costs associated with regulation of the North Star load. N. Star Steel, 68 Fed. Cl. at 699. While the court expressed skepticism about WAPA's inability to document costs, see id. at 699-700, it did not make a finding that cost data

did in fact exist or that WAPA intentionally withheld any cost data, see id. at 701 ("Since it would not have been cost-effective for the court to have ordered an independent audit of the Bureau of Reclamation and/or WAPA's accounting records to ascertain whether cost data existed, the court suggested, and the parties agreed, to appoint an independent expert . . . ."). Nor has North Star called our attention to any evidence that would support a finding of bad faith. The second finding upon which the court relied for its breach determination was that substantial expert testimony confirmed that WAPA did not establish a cost-based methodology with AEPCO/North Star. Id. at 701-21. However, for the reasons discussed in the preceding paragraph, a finding that WAPA did not establish a cost-based methodology, absent a finding of bad faith, is insufficient as a matter of law to establish a breach of the CAC by WAPA.

IV.

Turning to the issue of duress, the government recognizes that North Star agreed to Amendment No. 3 under protest, thereby apparently involuntarily accepting WAPA's terms. The government argues, however, that the Court of Federal Claims erred in finding that North Star had no alternative other than to sign Amendment No. 3 because North Star could have refused to sign Amendment No. 3, could have continued to receive power transmission services from WAPA at the negotiated twenty percent rate, and could have left intact WAPA's contractual obligation to negotiate a mutually acceptable cost-based methodology. The government also takes issue with the Court of Federal Claims' ruling that because Amendment No. 3 was not cost-based, WAPA breached its duty to negotiate in good faith, and therefore acted coercively towards North Star. The government reiterates that the facts found by the Court of Federal

Claims do not support a determination of bad faith. North Star counters that the Court of Federal Claims' ruling that North Star had no alternative but to agree to Amendment No. 3 was proper because WAPA controlled not only the sole transmission system available to transmit energy to North Star, but also the data necessary to develop a cost based methodology. North Star argues that signing Amendment No. 3 was the only way to obtain any reduction in the twenty percent surcharge in effect. Therefore, it urges, it signed under duress.

Again, we agree with the government. To render a contract unenforceable for duress, a party must establish (1) that it involuntarily accepted the other party's terms, (2) that circumstances permitted no other alternative, and (3) that such circumstances were the result of the other party's coercive acts. Freedom NY, 329 F.3d at 1329. As seen above, the Court of Federal Claims stated the correct three prong test for duress. However, while it is undisputed that AEPCO signed Amendment No. 3 under protest, which satisfies the first prong of the duress test, the court's findings of fact do not support a determination of duress. The reason is that the third prong of the test—that the circumstances which North Star faced were the result of WAPA's coercive acts— was not met.[8]

The third prong is not met because there was no wrongful action by the government. For the third prong of economic duress to have been met in this case, the circumstances which North Star confronted must have resulted from WAPA's coercive

---

[8]    Because we conclude that the third prong of the duress test was not met, it is not necessary for us to address the government's argument that the Court of Federal Claims erred in holding that the second prong was met. We thus express no view on that question.

acts. As the Court of Federal Claims itself stated, "coercion requires a showing that the Government's action was wrongful, i.e., '(1) illegal, (2) a breach of an express provision of the contract without a good-faith belief that the action was permissible under the contract, or (3) a breach of the implied covenant of good faith and fair dealing.'" N. Star Steel, 69 Fed. Cl. at 721 (citing Freedom NY, 329 F.3d at 1330). There is no evidence that WAPA acted illegally. At the same time, we have held in Part III above that the Court of Federal Claims erred in holding that WAPA breached the contract by failing to utilize a cost-based methodology. We also have held, as a matter of law, that there could be no breach of contract because there was no finding that WAPA failed to negotiate in good faith with respect to the development of a cost-based methodology and no showing of evidence to support a finding of bad faith. Under these circumstances, the situation in which North Star found itself could not, as a matter of law, be said to have been the product of coercive conduct on the part of WAPA, which is what is required by prong three of the duress test. For these reasons, the Court of Federal Claims erred in holding that Amendment No. 3 to the CAC was signed under duress.

## CONCLUSION

Because the Court of Federal Claims' findings of fact do not, as a matter of law, support the court's holding's (i) that WAPA breached the contract of which North Star was a third party beneficiary, and (ii) that North Star agreed to Amendment No. 3 to the CAC under duress, the judgment in favor of North Star is reversed. The case is remanded to the Court of Federal Claims, which is instructed to enter judgment in favor

of the United States and dismiss North Star's Second Amended Complaint.  In view of our decision, it is not necessary for us to reach North Star's cross-appeal.

REVERSED and REMANDED