# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| Aegis Defense Services, LLC, | ) ASBCA Nos. 59082, 60111, 60259 |
| f/k/a Aegis Defence Services Ltd. | ) |
| | ) |
| Under Contract No. W52P1J-11-D-0082 | ) |

APPEARANCES FOR THE APPELLANT: Armani Vadiee, Esq.
Ashley N. Amen, Esq.
  Smith Pachter McWhorter, PLC
  Tysons Corner, VA

APPEARANCES FOR THE GOVERNMENT: Raymond M. Saunders, Esq.
  Army Chief Trial Attorney
  MAJ David H. Stem, JA
  Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE PROUTY

Although the facts of these appeals are intriguing, involving, as they do, the Milo Minderbinderesque (*see* JOSEPH HELLER, CATCH-22 (Simon & Schuster 1961)) machinations sometimes necessary to do business in Iraq, in the end the issues presented are quite straightforward: what are the government's obligations to a contractor to which it gave a right of first refusal to purchase armored sport utility vehicles (SUVs), known as LAVs (short for "light armored vehicles") at the completion of contract performance, so long as it had no further need for them? And did the government meet those obligations when it refused to sell the LAVs to its contractor and, instead, gave them to the Government of Iraq, unbidden? As explained below, although the United States had its reasons for declining to make the sale to its contractor, those reasons do not excuse it from complying with its contractual obligations.

## FINDINGS OF FACT

### I.     The Contract and Efforts of the Government to Furnish Aegis with LAVs

On 1 June 2011, the Rock Island Contracting Center (the Army) awarded the above-captioned contract (the contract) to appellant's predecessor in interest, Aegis Defence Services Ltd. (Aegis), a company doing business in the United Kingdom (R4, tab 1 at 1). As explained at the hearing, Aegis is primarily in the business of providing private security services to governments and commercial

organizations (tr. 1/14). The contract, which was a multiple-award indefinite-delivery/indefinite-quantity (ID/IQ) contract[1], was for the provision of security support services to the United States Department of Defense and Department of State in Iraq (R4, tab 1 at 4, 24; tr. 1/17-18).

Aegis was awarded Task Order No. 0002 (TO 2) on the contract on 2 September 2011, and both parties executed it on 13 September 2011 (R4, tab 3 at 203). TO 2 was intended to provide mobile and staffing security to various sites within Iraq (tr. 1/23). This task order required Aegis to reach "full operational capability" by the end of the month, and included a period of performance for the base year to conclude at the end of 2011 (R4, tab 3 at 206). TO 2 was priced at more than $28 million for this first period of performance (*id.* at 230), and it included the prospect of up to four additional option years (*id.* at 206).

With respect to the LAVs that are at the heart of this dispute, TO 2, which contemplated the government's providing such vehicles, took a very different approach than the original contract, which required the contractor to provide them and to keep ownership of them through the conclusion of contract performance. The original contract directed, in section 13.1.5.1, that Aegis would "provide all weapons, ammunition, LAVs [and other equipment]" (R4, tab 1 at 73). Section 13.1.5.2 of the contract further stated that "Vehicles [including LAVs] provided by the Contractor in support of providing transportation services for this contract shall remain the Contractor's property. The Government will not own or accept ownership of any vehicles furnished to it by the Contractor." (*Id.*) The Performance Work Statement (PWS) of TO 2, by contrast, stated, in paragraph 11.0, that, "[t]he Government will provide 155 LAVs for use to perform the required services under this task order" (R4, tab 3 at 235). The TO 2 PWS further elaborated, in paragraph 12.0, that, except for the LAVs, the remainder of the equipment utilized by Aegis would be "Contractor furnished" (*id.*), consistent with the dictates of the original contract (*see also* tr. 1/23-27).

When Aegis bid on TO 2, it took into account the fact that it would not be required to provide its own LAVs, and priced its offer accordingly (tr. 1/25-26). Almost immediately after Aegis began performance of TO 2, though, it became clear that the notion of government-provided LAVs was problematic.

---

[1] A multiple-award ID/IQ contract is a contractual vehicle by which the government awards similar contracts to several different contractors and then (subject to any requirement to make minimum awards to each contractor) awards separate task orders on that contract to whichever contractor it chooses for the particular task order. Typically, contractors submit competing bids to the contracting officer to vie for the award of the task orders. *See, e.g., Relyant, LLC,* ASBCA No. 58172, 16-1 BCA ¶ 36,228 at 176,748-49.

2

Iraq in 2011 was a country in the midst of a significant transition, with the expectation that American military forces would soon leave the country as a result of the United States keeping its commitment to remove its military presence from that sovereign nation (tr. 1/24-25). One of the consequences of this transition was the Iraqi government's greater involvement in the regulation of private security contractors (PSCs) operating within its territory – even those PSCs working on behalf of the United States. With respect to LAVs operating on the open road in Iraq, the Private Security Department of the Iraqi Ministry of the Interior required a "vehicle sticker" on such vehicles (tr. 1/26). Before providing such a sticker, the Iraqi Ministry of the Interior required proof of ownership, which had to be obtained through the Iraqi Ministry of Transport (tr. 1/26-27). And without such a sticker, Aegis had a real concern that, as soon as one of its LAVs encountered a checkpoint manned by Iraqi troops, the LAV would be impounded and its occupants arrested (tr. 1/18-19, 28).

The United States Government Office of Security Cooperation – Iraq (OSC-I) worked with Aegis to get stickers from the Iraqi government for the LAVs that the Army intended to provide (tr. 1/28-30). These efforts were extensive, involved embassy and other personnel, and lasted through November 2011, culminating in OSC-I's obtaining a letter from a senior Iraqi official that, unfortunately, proved insufficient for registration purposes (*id.*). At some point, it was suggested that the matter could be resolved if Aegis purchased LAVs in its own name and then approached the appropriate Iraqi ministries as the actual owner of the LAVs (tr. 1/29). Ms. Melissa Burant, the contracting officer (CO), ultimately requested Aegis to submit a formal proposal to do just that (tr. 1/31-32).

II.     Aegis and the Government Agree that Aegis will Purchase the LAVs; They also Agree upon Terms Regarding the Possible Procurement of the LAVs by Aegis after Completion of Contract Performance

In response to Ms. Burant's request, Aegis investigated the commercial marketplace for such vehicles and found an Iraqi commercial supplier. Aegis then prepared a proposal that it submitted to the Army, based upon obtaining the LAVs from the Iraqi supplier[2] (tr. 1/32). The first informal proposal, for between 50 and 80 LAVs, was sent from Aegis to the Army on 11 November 2011 (supp. R4, tab 72). After some back and forth, a more formal amended proposal was sent by Aegis to the Army on 11 December 2011 (tr. 1/33-34; app. supp. R4, tab 1).

---

[2] The LAVs were "up-armored" commercial SUVs. Though Aegis proposed using the Toyota Land Cruiser for its lower "profile," American personnel strongly preferred the relatively roomier Chevrolet Suburban, which was what they got (tr. 1/34-35).

The 11 December proposal (drafted by Aegis's in-house counsel, Ms. Sylvia White (*see* tr. 1/37)), was for the purchase of 54 LAVs at $138,375 per unit (app. supp. R4, tab 1 at 8319[3]) and included three provisions relevant to the dispute here. First, the revised proposal included a statement regarding the costs of transferring ownership from Aegis to the government at the end of contract performance:

> For the avoidance of doubt any costs associated with transferring ownership to the Government at the end of the Contract will be for the Government's account.

(App. supp. R4, tab 1 at 8319) To be clear, what Aegis meant was that costs incurred in transferring ownership to the government would be paid by the government (tr. 1/36).

The second material provision in the Aegis proposal states that, "the [LAVs] would be the property of the Government (as CAP), [but] Aegis would hold the vehicles to the Government's order, but in Aegis name" for purposes of getting them registered with the Iraqi government (app. supp. R4, tab 1 at 8320). Ms. White testified that she, herself, was not particularly well-acquainted with the term, CAP, which she took to mean "contractor acquired property," as utilized by the Federal Acquisition Regulation (FAR), but that she included it in an attempt to conform the proposal to the FAR (tr. 1/75-76).

The third, and final, material provision provided that:

> At the end of the Contract Aegis will be given the right of first refusal to purchase the vehicles in the event the Government has no further use for them. We propose a straight line amortization over a 2 year period with a 5% residual value.

(App. supp. R4, tab 1 at 8320 (footnote omitted))

Notably, Ms. White testified that, when she drafted the proposal on behalf of Aegis, she envisioned the LAVs as being owned by the government, notwithstanding their being titled to Aegis with the Iraqi government (tr. 1/76).

---

[3] The pages in appellant's supplemental Rule 4 file include consecutive numbers both at the upper right-hand corners of each page and at the bottom right-hand corners of the pages, which appear to be the numbers utilized when the government produced the documents in discovery. Because, during the trial, counsel and the witnesses tended to reference the consecutive number on the bottom right-hand corner of the document, that is the number we use herein.

On 19 December 2011, Ms. Burant sent an email to Ms. White of Aegis, forwarding a notice to proceed (NTP) with the purchase of 14 LAVs at the 11 December proposal price of $138,375 each (app. supp. R4, tab 2 at 227-29; *see also* tr. 1/40). Funding issues, apparently, were the reason for the discrepancy in the number of LAVs proposed on 11 December and the number ordered through the NTP (tr. 1/40). On 20 December 2011, as requested by Ms. Burant (*see* app. supp. R4, tab 2 at 227), Aegis acknowledged acceptance of the terms of the NTP (which was to be formalized by a modification to the TO), but added a handwritten note above the signature block from Ms. White:

> Except with respect to numbers of vehicles to be purchased, which is limited by the value of funding in this NTP all other terms included in Aegis' proposal dated 11 December 2011 apply to this purchase.

(App. supp. R4, tab 2 at 230; tr. 1/41)

Ms. White continued discussions with government personnel in an attempt to reach agreement upon the terms of the contract modification so that it could be completed and Aegis's invoices for the LAVs could be paid before the New Year (app. supp. R4, tab 4). On 23 December 2011, the parties executed Modification No. 06 to TO 2 (Mod 6) (R4, tab 13 at 385). The purpose of Mod 6 was to fund the purchase of the 14 LAVs, and it expressly provided that, "Aegis proposal, submitted via e-mail, dated 19 December 2011 is incorporated to the award" (*id.* at 387). We are aware of no proposal from Aegis to the government dated 19 December 2011 as referenced in this modification, but Mod 6 includes the 11 December 2011 proposal as an attachment (*id.* at 390-94).

In the meantime, the parties negotiated amendment of the terms of the TO 2 PWS to provide for the use of the Aegis-acquired LAVs. As communicated to Aegis in a 19 December 2011 email, the government's view about the sentence in its proposal that Aegis would have the right of first refusal if the government had "no further use for" the LAVs was that the condition was acceptable, inasmuch it was stated to be "incorporated" into the government-proposed PWS revision without further comment (R4, tab 15 at 408). The government, however, did not agree to the proposed straight-line depreciation for the LAVs, and preferred language simply specifying that the government would negotiate with Aegis at the end of the contract if it were not taking the vehicles (*id.*). Ms. White's response to the government's draft did not address these particular matters (*id.* at 403), tacitly suggesting that Aegis was satisfied with the proposed revised PWS provisions regarding the right of first refusal and pricing issues. The record includes no further correspondence regarding the right of first refusal language prior to the conclusion of negotiations over the PWS revision.

5

Modification No. 07 to TO 2 (Mod 7), effecting the revision of the PWS to account for the purchase of the LAVs, was executed on 9 January 2012 (app. supp. R4, tab 7 at 1977). The modified PWS (dated 3 January 2012) incorporated into TO 2 by Mod 7, provided in relevant part:

> All LAVs purchased by the contractor for use on this contract will be registered and licensed in contractor's name to facilitate [Government of Iraq] licensing. Govt will provide reimbursement for costs associated with licensing, registration, taxes, renewal fees and title transfer fees imposed by the Government of Iraq. At the end of contractor's performance period on this Task Order, USG will retake title to LAVs. If USG does not wish to take title to the vehicles, contractor will be given first right of refusal[4] on negotiating and possible procurement of said vehicles.

(App. supp. R4, tab 7 at 1983) Nothing in this modification referenced Mod 6 or addressed what was to be done in the event that its terms were inconsistent with the terms of Mod 6 (*see* app. supp. R4, tab 7).

The government obtained more funding for LAVs shortly thereafter, and on 25 January 2012, presumably at the government's request, Aegis submitted an updated proposal to Ms. Burant for the purchase of an additional 38 LAVs (app. supp. R4, tab 8 at 571-72). The terms of the proposal were similar to those in Aegis's 11 December 2011 proposal, with a few variances not relevant to the present dispute. In particular, the 25 January proposal included, word-for-word, the clause providing for Aegis's "right of first refusal" to purchase the LAVs at the end of performance if "the Government has no further use for them" (app. supp. R4, tab 8 at 573). On 30 January 2012, Ms. Burant sent Ms. White an email forwarding an NTP to purchase the additional 38 LAVs "in accordance with" the 25 January proposal (*id.* at 570).

On 13 February 2012, the parties executed Modification 10 to TO 2 (Mod 10), to effect the purchase of the 38 LAVs provided for in the 30 January NTP (R4, tab 23 at 615). Like Mod 7, it included an amendment to the TO 2 PWS using the same exact language stating that at the end of performance period, the government would retake title of the LAV, but that if the government "does not wish to take title to the vehicles, contractor will be given first right of refusal on negotiating and possible

---

[4] Here, the language departed from the "right of first refusal" used in earlier correspondence to become "first right of refusal." Neither party has remarked upon the difference, and we see no material difference in the phrases, which we consider to be interchangeable.

6

procurement of said vehicles" (R4, tab 23 at 623). The record includes no intermediate modification affecting the NTP for the 38 LAVs in the way that Mod 6 did for the first 14 LAVs. In any event, nothing in Mod 10 referenced the NTP or addressed what was to be done in the event that Mod 10's terms were inconsistent with the terms of the NTP (*see* R4, tab 23).

Aegis purchased the 52 LAVs embraced by Mods 6, 7, and 10, took title to them, and successfully registered them with the appropriate Iraqi authorities (tr. 1/52-53). There were no disputes between the parties regarding their use.

### III. The Government Refuses to Sell the LAVs to Aegis

As contract performance neared completion, Aegis expressed a desire to negotiate the purchase of the LAVs from the government. The first evidence of this expression in the record is an internal Army email dated 4 June 2013 in which an Army contracting specialist named Trisha Polfliet notified her chain of command of Aegis's wish to obtain the LAVs, and inquired whether the government wanted to keep the LAVs for itself (R4, tab 33 at 722; *see also* tr. 1/58 (Ms. White recalls making inquiries regarding keeping the LAVs approximately July 2013)).

In response to Ms. Polfliet's email, the government began the process of deciding whether it had a use for the vehicles (R4, tab 33 at 719-21). The Defense Contract Management Agency (DCMA) property managers to whom this task was forwarded were taken by surprise, to say the least (*see generally,* R4, tab 34). On 6 June 2013, Jeff Garrett, the Department of Defense (DoD) Demilitarization Program Manager, responded to the internal inquiry by stating that DoD was "not authorized to sell excess military equipment in Iraq especially Armored vehicles" and explained that the LAVs needed to be "turned in to OSC-I" (*id.* at 724).

By 21 June 2013, however, it appeared that those being consulted were in favor of selling the vehicles to Aegis and that any internal obstacles to the sale had been overcome. On that date Army LTC John Turner, in an email on behalf of OSC-I, responded to renewed questions about the LAVs by stating, "If Aegis wants the vehicles, that is their right IAW the contract. No argument from OSC-I." (R4, tab 36 at 731) After a few additional email exchanges about the mechanics of the LAV sale to Aegis, on 25 June 2013, Ms. Polfliet asked LTC Turner for confirmation regarding their use before she could move forward: "Basically we need the USG to state they don't need them." She also expressed her desire to sell the LAVs to Aegis so that the government could obtain the money to put towards the contract. (R4, tab 37 at 734) LTC Turner's response later the same day was, "please use this email to serve as official notice that the USG will not require the 52 purchased vehicles for operations post site closure and normalization." He then offered to provide a memorandum more formally stating the same if the email were insufficient.

7

(*Id.*) Ms. Polfliet forwarded this email to Mr. John Gorman, the DCMA Property Manager for Iraq, who responded that it satisfied him and told her to go ahead and "negotiate directly with Aegis on the purchase of these vehicles" (R4, tab 39 at 752).

That was not, however, the end of the story. On 2 July 2013, in an email response to Ms. Polfliet, who was ensuring that she "cross[ed] all of our T's" for the negotiation with Aegis (R4, tab 40 at 755), Mr. Garrett, the DoD Demilitarization Program Manager, who earlier sent the email stating that such sales were forbidden, again voiced his concerns. In short, Mr. Garrett explained that up-armored SUVs were considered to be subject to the Department of Commerce Arms Export Regulation, and, as such, DCMA had no authority to release them to Aegis. He did hold out the possibility that a purchase could be coordinated through the "LM&R" office of the Office of the Secretary of Defense. (*Id.* at 754)

Apparently unaware of any flies in the ointment, on the 4th of July 2013, Aegis sent ACC-RI additional information regarding the 52 LAVs that it wished to purchase (R4, tab 41 at 772). An internal government discussion followed (*see, inter alia*, R4, tab 44). In a 10 July 2013 email that was part of this discussion, an OSC-I representative explained that OSC-I's need to rapidly wind down sites meant that its flexibility in dealing with the vehicles continually diminished, and that the "default position" was to "FEPP"[5] the vehicles to the Government of Iraq (*id.* at 806-07). In a further email exchange the same day, after agreeing that the export controls on the armored vehicles had an exception that allowed their transfer to the Government of Iraq, Mr. Garrett reiterated to Ms. Polfliet that, "[c]urrently DOD can't sell or release Demil Code Q/3 (sensitive) [which is the category that he earlier explained applied to the LAVs] out DOD [sic] to civilians" (*id.* at 804-05). He further noted that the DoD policy on the matter was being updated, but that he expected "no major change" (*id.* at 804). Ms. Polfliet forwarded the material part of Mr. Garrett's email to Ms. White, of Aegis, the next day (R4, tab 45 at 826).

In her email response to Ms. Polfliet sent on 12 July 2013, Ms. White thanked her for the information and informed her that she would have Aegis's American attorneys look into the issue "to see if they have any bright ideas" (R4, tab 45 at 825-26). In a follow-up email sent the 23rd of July, Ms. White inquired about why the LAVs were considered to be "Demil Code Q/3 and whether they [had] ever officially been classified as such by the US Government." She further shared that Aegis was of the opinion that the LAVs should not be considered to be subject to the Department of Commerce demilitarization classifications since they were purchased, titled, and registered to Aegis, not the United States. (R4, tab 45 at 825) Responding to Ms. Polfliet's email forwarding this exchange on the 24th of July,

---

[5] "FEPP" stands for Foreign Excess Personal Property. "FEPPing," in this context, means transferring ownership of property to the Government of Iraq. (Tr. 1/84)

Mr. Gorman, the DCMA Iraq Property Manager, appeared to agree that the LAVs were contractor-furnished equipment and thus not covered by the demilitarization rules (*id.* at 824).

Nevertheless, by the next day, the 25th of July, Ms. Polfliet received new direction that would end up as the final government position. As she explained to Ms. White, since the LAVs were bought with government funds, they were considered to be government-furnished equipment to which the demilitarization rules applied. And noncombat commercial armored vehicles were apparently classified as "Q." (R4, tab 49 at 872) Although the record is unclear, it appears to us that Ms. Polfliet's position was based upon direction given to her by the new CO, Ms. Jodie Bennett (*see* tr. 1/141-43).

According to her testimony, which we find to be credible, Ms. Bennett's decision-making with respect to the disposition of the LAVs was driven almost completely by the advice she received from Mr. Garrett, the DoD demilitarization expert, who had communicated that the sale of the LAVs would be contrary to governing regulations (tr. 1/143). She did not FEPP the LAVs to the Government of Iraq because the United States had a particular need to give them to the Iraqis; rather, she did so because the vehicles needed to be disposed of at the end of the contract and FEPPing them to the Iraqis was preferred to simply destroying them, which was also an option (tr. 1/143-44). Thus, we specifically find that the decision to FEPP the LAVs, rather than sell them to Aegis, was not made for reasons involving national security or foreign policy, but was simply the path taken to dispose of them once the government, rightly or wrongly, internally decided that it could not transfer them to Aegis on contract completion.

We also find that the government had no use for the LAVs upon contract completion. This finding is based upon CO Bennett's earlier-discussed testimony regarding her motivation for disapproving the sale as well as her testimony, in response to the Board's questions, that nobody had actually particularly wanted to give the LAVs to Iraq, except as a means of their disposal (tr. 1/143-44) and OSC-I's earlier-noted statement that the government had no further use for the LAVs.[6] Interestingly, in early August 2013, some government personnel explored the options available for exporting at least some of the LAVs to other countries in the region for use in security contracts so that the money already spent on them would not be wasted. To that end, the persons involved in this discussion affirmatively did not wish for the

---

[6] To the government's credit, the CO's final decision in response to Aegis's non-monetary claim upon this matter did not assert that there was a use for the vehicles; stating, instead, that the future use of the vehicles was irrelevant to the government's decision-making (R4, tab 63 at 1042-43).

LAVs to be FEPP'd to the Iraqis (*see* R4, tabs 47-48). Unfortunately, however, the export of these LAVs proved to be impracticable (*see* R4, tab 48).

Through a series of emails in early to mid-August 2013 to Ms. Bennett and her supervisor, Ms. Christine Berry, Ms. White attempted to persuade the government to change its mind regarding the LAVs prior to their transfer to the Iraqis (R4, tabs 49, 52-53). One matter of particular concern to Ms. White was the possibility that LAVs FEPP'd to the Government of Iraq might simply be handed over to a different security contractor by that government (R4, tab 53 at 934-35). CO Bennett agreed that such a thing had happened, though it should not have (app. supp. R4, tab 24 at 4428-29). In the end, however, the government felt that it could not budge (R4, tab 53 at 936). On 17 September 2013, Ms. White submitted a non-monetary claim to the CO seeking a contractual interpretation permitting the sale of the LAVs to Aegis as part of an effort to get the government to reconsider and make a definitive decision[7] (*see* R4, tab 56; tr. 1/60). This claim was denied in due course in a final decision by CO Bennett dated 25 October 2013 (R4, tab 63). That decision was appealed on 20 December 2013 and docketed as ASBCA No. 59082.

In the end, the LAVs were all[8] FEPP'd to the Iraqis in April 2014 (supp. R4, tab 95). The FEPP paperwork included a statement by the Deputy Chief of OSCI-C that the FEPP transfer was "for the benefit of both the [Government of Iraq] and the United States (US) Government," and "will contribute significantly to [US] efforts [to help] Iraqi Security Forces" (supp. R4, tab 95 at 2936).

Aegis submitted two monetary claims to the CO in 2015. The first, in the amount of $3,709,843.75, was submitted on 7 May 2015 for 37 LAVs (supp. R4, tab 96). It was denied by the CO on 4 June 2015 (supp. R4, tab 97), appealed by Aegis on 27 July 2015, and docketed as ASBCA No. 60111. The second monetary claim, in the amount of $1,081,187.50, for 13 LAVs, was submitted by Aegis on

---

[7] The claim turned out not to be quite the last effort on Aegis's part. In early October 2013, Aegis's director, Brigadier James Ellery, sent an email directly to LTG John Bednarek, chief of OSC-I in an attempt to get the government to change its mind. The two engaged in what appears to have been a friendly and constructive colloquy about the issue, with LTG Bednarek ultimately explaining that the government would have liked to have sold the LAVs to Aegis and been paid for them, but had felt compelled to follow its interpretation of the regulations that precluded such a sale. (R4, tab 62)

[8] The FEPP paperwork indicates that only 50 LAVs were FEPP'd to the Government of Iraq (app. supp. R4, tab 28 at 463), rather than the full 52 at issue in the contract. The discrepancy is likely resolved by the fact that at least 1, and perhaps 2 of the original 52 LAVs had become inoperable by the time of contract completion (*see* tr. 1/61-62).

27 July 2015 (supp. R4, tab 98). The record does not include a CO's final decision upon this claim, and its deemed denial was appealed by Aegis on 2 October 2015 and docketed as ASBCA No. 60259.

## DECISION

We do not second guess the government's motives in its apparently sincerely held belief that it was precluded from selling the LAVs to Aegis, as contrary to common sense as it may seem. The consequence of acting upon that belief, however, is that the government broke its contractual promise to Aegis to give it a right of first refusal to purchase the LAVs if the government had no use for them. As the government, in fact, had no use for the LAVs and as the contract was definite enough to pass legal muster and no other circumstances were proved to excuse performance, we rule in favor of Aegis on entitlement.

I.      The Contractual Language Required the Government to Offer to Sell the LAVs to Aegis if the Government had No Use for Them

The terms of the contract material to this dispute are, at first blush, not as clear as we would like them to be. The government argues, consistent with the terms of the amended PWS, that the sole determinant of triggering Aegis's right of first refusal was whether the government wished to take back "title" to the LAVs (gov't br. at 19-24). This would make Aegis's rights turn upon the subjective desires of the government and have nothing to do with whether the government had an alternate use for the LAVs. The contract terms, however, are not so plainly focused upon the term, "title," as the government would like and, as will be seen, ultimately support Aegis's preferred reading: that Aegis had the right of first refusal if the government had no further use for the LAVs.

To resolve this issue, we begin with the law of contract interpretation. Under basic principles of the law, a contract is interpreted "in terms of the parties' intent, as revealed by language and circumstance." *United States v. Winstar Corp.*, 518 U.S. 839, 911 (1996) (citations omitted). Generally, this process begins and ends with the language of the contract. *TEG-Paradigm Environmental, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006). And in reviewing this language, the Board should read the contract "as a whole and [interpret it] to harmonize and give reasonable meaning to all its parts," if possible, leaving no words "useless, inexplicable, inoperative, insignificant, void, meaningless or superfluous." *Precision Dynamics, Inc.*, ASBCA No. 50519, 05-2 BCA ¶ 33,071 at 163,922; *see also Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002) ("contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract"); *Hunkin Conkey Constr. Co. v. United States*, 461 F.2d 1270 (Ct. Cl. 1972) (rejecting contract interpretation that would render a clause in the contract meaningless).

11

With this in mind, we turn to the terms of the contract, which are more expansive than admitted by the government. The government's insistence that we are limited to the terms of the PWS is contradicted by the parties' adoption of the terms of Aegis's 11 December 2011 proposal into Mod 6 as well as the government's adoption of those terms into the NTP that preceded Mod 6 and into the NTP that preceded Mod 10. That proposal, of course, included the language granting the right of first refusal to Aegis if the government had no use for the LAVs. Because Mod 6 is part of the contract[9] and because Mod 7 made the revised PWS part of the contract (without explicitly replacing or rejecting the terms of Mod 6), we are presented with a requirement to reconcile these contractual terms. *See, e.g., Hunkin Conkey*, 461 F.2d 1270.

The most direct way to reconcile the seemingly different contract terms ("no further use" in the proposal versus the government's "wish[ing] to take title" in the PWS) is to interpret the title language in the PWS as the equivalent of the use language in the earlier-drafted proposal. To understand how this can be so, we digress slightly to discuss the meaning of "title" in the PWS. Although the parties were both of the belief that, as property acquired under the contract, the LAVs were the government's property, both parties also recognized that the LAVs had to be titled to Aegis so that it could engage with the Iraqi government to obtain the necessary sticker. At the end of the contract, even if the government had always equitably owned the LAVs, in order to *use* them in Iraq or elsewhere, it would need to take title to them. To the contrary, if the LAVs were only to be destroyed or handed to a different contractor (or the Government of Iraq), there would be no need for the government to take title for itself. Thus, taking title, as a practical matter, would only be done in the event that the government had use for the LAVs, and would not be done if it did not. We do not perceive – and the government does not present – an alternate interpretation of the contract that reconciles the two writings. Moreover, this interpretation has the great merit of being exactly what the parties intended[10], as reflected in the government's previously-discussed 19 December 2011 email correspondence with Aegis, in which it informed Aegis that its proposal, regarding a right of first refusal to purchase the LAVs if the government had no use for them, had been incorporated into the PWS except for the straight-line depreciation issue. *See Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558

---

[9] The government asserts, without support, that the PWS in Mods 7 and 10 "superseded" the incorporation of Aegis's proposal by Mod 6 (gov't br. at 20). Nothing in Mod 7 or Mod 10 supports this conclusion with respect to the terms at issue here.

[10] Aegis asks us to make an adverse inference against the government with respect to its intent because of its failure to produce Ms. Burant as a witness (app. br. at 25-27). Drawing such an inference is unnecessary here, given that the documentary evidence amply explains the parties' intents and there is no reason to believe that Ms. Burant's testimony would be materially any different than Ms. White's. The government's failure to call a witness that the appellant believes would be helpful to appellant's case, without more, does not justify an adverse inference.

(Fed. Cir. 1982) (contemporaneous construction of an agreement prior to dispute is entitled to great weight).

Additionally, we reject the government's attempt to make hay of the fact that there was no equivalent to Mod 6, incorporating the terms of the Aegis proposal for the purchase of the first 14 LAVs (which preceded Mod 7), for Mod 10, involving the later 38 LAVs (*see* gov't br. at 22). Through reconciliation of the terms of Mods 6 and 7, the meaning of the revised PWS was already established by the time of Mod 10; there is simply no need to revisit its interpretation.

## II.    The Government Had No Use for the LAVs After Contract Performance

Although the government asserts that its handing the LAVs to the Iraqi government furthered a valid national security aim and thus advanced a legitimate government purpose (*see* gov't br. at 22), the overwhelming weight of the evidence is to the contrary. LTC Turner's emails on behalf of OSC-I certifying that the government had no use for the LAVs are convincing evidence that there was no government need for them. Ms. Bennett's candid testimony that her decision to FEPP the vehicles was based completely upon the advice she received forbidding their sale, and had nothing to do with any government need for them constitutes further persuasive evidence that the government had no remaining use for them. There is also the notable absence in the email correspondence of any argument, whatsoever, that FEPPing the LAVs to the Iraqi government would be of any use to the United States Government.

To counter this evidence, the government presents the fact that the apparently standard government memorandum to justify the FEPPing of the LAVs included language stating that it was done in the interest of the government and for Iraqi security (gov't br. at 13). The government also states, in one sentence of its brief that, in being transferred to the Iraqi government, the LAVs were being legitimately used by the United States (*id.* at 22). There is nothing in the FEPPing memorandum that gives us any reason to believe that the statement about the use of the LAVs was anything more than a standard incantation with little evidentiary worth. The contemporaneous statements of LTC Turner; the extensive email thread; and Ms. Bennett's sworn testimony all prove otherwise.

Under the terms of the contract, the government had no use for the LAVs and was obligated to give Aegis the right of first refusal for their purchase, which it did not do.

13

III.    Aegis May be Entitled to Monetary Damages

        Due to prior agreement at the pretrial stage of these appeals, we only decide entitlement at this stage of the proceedings. Nevertheless, the government has argued that the terms of the contract are such that the damages are too speculative to support a finding of entitlement to money damages, as sought in Aegis's second and third claims and appeals (gov't br. at 27-30). In response, Aegis contends that arguments about damages are premature at this point in the litigation and that it is not seeking speculative damages; only the difference between what it paid for replacement LAVs and what it would have paid for the LAVs had the government complied with the contract and sold them to Aegis (app. reply br. at 11-13). Neither side's argument is completely correct.

        We start by noting that the theory upon which Aegis appears to be seeking damages is flawed. That damages theory is that, in accepting Aegis's 11 December 2011 proposal, the government agreed to a straight-line depreciation of the price of the LAVs over a two-year period with a 5% residual value. Damages, then, would be calculated by subtracting the depreciated price of the contractually obtained LAVs from the price that Aegis ultimately paid on the market for other LAVs that it bought to replace them for use in its post-contract Iraqi business (see supp. R4, tab 96 at 4 (damage analysis in first monetary claim), tab 98 at 1 (second monetary claim, adopting analysis of first)). But the contract did not mandate that the government depreciate the LAVs to almost nothing as Aegis first proposed.

        To be sure, as we discussed at length above, the contract incorporated both Aegis's 11 December 2011 proposal and its revised PWS. But while the proposal was firm that the right of first refusal would be triggered if the government had no use for the vehicles, it was not so firm about the means of calculating their price. With respect to use, the language was: "At the end of the Contract Aegis will be given the right of first refusal to purchase the vehicles in the event the Government has no further use for them" (app. supp. R4, tab 1 at 8320 (emphasis added)). By contrast, the price language, which immediately followed was: "We propose a straight line amortization over a 2 year period with a 5% residual value" (id.). Moreover, unlike the terms of the PWS that could be harmonized with the use language of the proposal, the PWS language on the terms of the sale specifically rejected the set price proposed by Aegis's proposal, and stated: "If USG does not wish to take title to the vehicles, contractor will be given first right of refusal on negotiating and possible procurement of said vehicles" (app. supp. R4, tab 7 at 1983 (emphasis added)). This was consistent with the government's written response to Aegis's proposal in which it specifically rejected the set depreciation rate and proposed negotiations, instead (R4, tab 15 at 408). We thus interpret the contract modifications together, to provide that Aegis and the government agreed to negotiate a price for the LAVs if the government had no use for them, but not to adopt the pricing formula proposed by Aegis.

14

Although this interpretation might diminish Aegis's damages – and certainly makes them less easily quantifiable – it does not prevent us from finding a breach of contract or making a monetary award. What we are presented with in this contract is an agreement to negotiate over a matter – in other words, an "agreement to agree," which imposes upon the parties an obligation to negotiate in good faith. *North Star Steel Co. v. United States*, 477 F.3d 1324, 1332 (Fed. Cir. 2007). Such agreements to agree have been held to be sufficiently definite to support the finding of the existence of a contract, *see, e.g., Gardiner, Kamya & Assocs., P.C. v. Jackson*, 369 F.3d 1318, 1322 (Fed. Cir. 2004) (citing cases), and we see no reason to depart from this precedent at this time. Of course, if the parties are unable to resolve the quantum of this appeal upon remand, Aegis will be obligated to present evidence of the value of its agreement that was breached by the government, but we have no need to further address the measure of damages here and now.

## IV. The Government Has Not Presented a Legal Impossibility Defense

Finally, we briefly address the matter of a defense that has not been raised by the government, but is so implicit in the facts leading up to the contract breach that we feel obligated to acknowledge it: was the government legally barred from selling the LAVs to Aegis? If so, does this suggest that both parties were under the misapprehension when they agreed to Mods 6, 7 and 10, that the government could sell the LAVs to Aegis when, in fact, it could not, thus presenting the defense of mutual mistake of law?

Mutual mistake is an affirmative defense. *See, e.g, K-Con Building Systems, Inc. v. United States*, 131 Fed. Cl. 275, 332 (2017); *Ameriserv Trust v. United States*, 125 Fed. Cl. 733, 747 (2016); *see also East-Wind Industries, Inc.*, ASBCA No. 25684, 86-1 BCA ¶ 18,698 at 93,987 (holding that mutual mistake is "not merely" an affirmative defense, but also, effectively, a counterclaim). As an affirmative defense, it must be pled and proved. *See* Board Rule 6(b) (requiring affirmative defenses to be pled in the government's answer); *Northrop Worldwide Aircraft Services, Inc.*, ASBCA Nos. 45216, 45877, 96-2 BCA ¶ 28,574 at 142,630-31 (failure to timely raise affirmative defense may waive it); *Kellogg Brown & Root Services, Inc.*, ASBCA No. 58175, 15-1 BCA ¶ 35,988 at 175,823 (burden of proof). The government did neither here.

The defense of mutual mistake is not present in the government's answer or in any pre- or post-trial filing in this appeal. Moreover, even when Aegis raised a related matter in its opening post-trial brief (primarily arguing that, because it had not been raised as a defense, the government could not rest upon a DoD regulation to excuse its performance (*see* app. br. at 36)), the government never claimed that it was presenting such a defense. Finally, at the hearing, the government presented no evidence (such as proof that the regulation actually prohibited the sale versus whether it was merely

15

perceived to do so) to prove such a defense.[11]  The defense is thus both waived and unproved.

## CONCLUSION

The government agreed to give Aegis a "right of first refusal" to negotiate a purchase of the LAVs obtained under the contract after the contract was over, so long as the government had no use for them.  The government, in fact, had no use for the LAVs, but declined to sell them to Aegis because of its belief that it was not permitted to do what it had agreed to do under the contract.  This was a breach of the contract for which the government has presented and proved no defense.  Accordingly, Aegis is entitled to those damages it can properly prove came from that breach.  The appeals are sustained and remanded to the parties to negotiate quantum.

Dated:  15 November 2017

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

LYNDA T. O'SULLIVAN
Administrative Judge
Armed Services Board
of Contract Appeals

---

[11] We do not know or speculate why the government chose this strategy, but recognize that there may have been very good reasons for it to do so.

16

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 59082, 60111, 60259, Appeals of Aegis Defense Services, LLC, f/k/a/ Aegis Defence Services Ltd., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

17